BLYTHE M. LINK v. JAMES C. LINK

No. 46

(Filed 10 March 1971)

1. **Trial § 40; Rules of Civil Procedure § 49— issues submitted to jury**

   It is the duty of the trial judge to submit to the jury such issues as are necessary to settle the material controversies raised in the pleadings.

2. **Trial § 40; Rules of Civil Procedure § 49— form and number of issues**

   While G.S. 1A-1, Rule 49(b), provides that issues shall be framed in concise and direct terms and that prolixity and confusion must be avoided by not having too many issues, the form and number of issues to be submitted is nevertheless a matter which rests in the sound dis-

cretion of the trial judge, assuming that the issue is raised by the pleadings, liberally construed.

**3. Fraud § 9; Duress; Cancellation of Instruments § 3; Husband and Wife § 4— fraud, duress, undue influence — sufficiency of allegations**

Allegations that defendant husband induced plaintiff wife to transfer to him certain securities by fraudulent concealment and that he "coerced" and "extracted" her signature to the transfer by threats and abuse are sufficient to justify submission to the jury of questions of fraud, duress and undue influence.

**4. Fraud § 1; Duress; Cancellation of Instruments §§ 2, 3— fraud, duress, undue influence**

While fraud, duress and undue influence are related wrongs and, to some degree, overlap, they are not synonomous, and proof of facts sufficient to show one does not necessarily constitute proof of either of the other two.

**5. Fraud § 1; Duress; Cancellation of Instruments §§ 2, 3— fraud, duress, undue influence**

Fraud rests upon deception by misrepresentation or concealment; duress is the result of coercion and may exist even though the victim is fully aware of all facts material to his decision; undue influence may exist where there is no misrepresentation or concealment of a fact and the pressure applied to procure the victim's consent to the transaction falls short of duress.

**6. Fraud § 7; Cancellation of Instruments § 2— confidential relationship — duty of disclosure — constructive fraud**

Where a transferee of property stands in a confidential or fiduciary relationship to the transferor, it is the duty of the transferee to exercise the utmost good faith in the transaction and to disclose to the transferor all material facts relating thereto, and his failure to do so constitutes fraud.

**7. Fraud §§ 4, 7— constructive fraud — intent to deceive**

Intent to deceive is not an essential element of constructive fraud resulting from breach of a fiduciary or confidential obligation.

**8. Husband and Wife § 1— confidential relationship between spouses**

The relationship of husband and wife is the most confidential of all relationships, and transactions between them, to be valid, must be fair and reasonable.

**9. Husband and Wife § 4; Cancellation of Instruments § 2— confidential relationship — separation of spouses**

The fact that the transactions in question occurred after the husband's departure from the home, following the wife's disclosure of her own misconduct, does not show that the previously established confidential relationship between them had terminated so as to free the husband to deal with the wife as if they were strangers.

Link v. Link

10. **Cancellation of Instruments § 2; Husband and Wife § 4— transfer of wife's stock to husband — husband's duty to disclose stock value**

The husband had a clear duty to disclose to his estranged wife the value of stock transferred by her to the husband without consideration where, in addition to the confidential husband-wife relationship, the husband was the president of the corporation whose stock was being transferred and so had full information of its value, the husband knew that the wife had neither such information nor general understanding of corporate securities, the stock is unlisted and is closely held by the husband's family, and the wife was laboring under great emotional strain at the time the stock was transferred.

11. **Duress — wrongful act or threat**

An essential element of duress is a wrongful act or threat.

12. **Duress; Cancellation of Instruments § 3— duress — threat to institute legal proceedings**

While ordinarily it is not wrongful and, therefore, not duress for one to procure a transfer of property by stating in the negotiations therefor that, unless the transfer is made, he intends to institute or press legal proceedings to enforce a right which he believes in good faith that he has, the threat to institute criminal or civil legal proceedings which might be justifiable *per se* becomes wrongful if made with the corrupt intent to coerce a transaction grossly unfair to the victim and not related to the subject of such proceedings.

13. **Duress; Cancellation of Instruments § 3— duress — action not wrongful per se — totality of circumstances**

Where a transaction is brought about by the use of threats to take action, not wrongful *per se*, the presence or absence of duress depends upon the totality of circumstances.

14. **Duress; Cancellation of Instruments § 3; Husband and Wife § 4— threat to obtain custody of children — coercion to obtain transfer of wife's property — duress**

An announcement by a husband, to whom the wife has confessed her adultery, that he intends to separate himself from her and to institute legal proceedings to obtain the sole custody of their children constitutes duress when made for the purpose of coercing her into transferring, without consideration, her individual property to the husband, the proposal being to leave the children in her custody if she make such transfer.

15. **Cancellation of Instruments § 3; Husband and Wife § 4— transfer of wife's property to husband — undue influence**

In an action to set aside the wife's transfer of corporate stock and debentures to her estranged husband, the evidence was sufficient to support a jury finding of undue influence, even if the jury found that there was no threat sufficient to constitute duress.

16. **Cancellation of Instruments § 12— submission of separate issues on fraud, duress and undue influence**

In an action to set aside the wife's transfer of corporate stock and debentures to her estranged husband, the trial court did not abuse

Link v. Link

its discretion in the submission to the jury of three separate issues on fraud, duress and undue influence, since an answer of any of the three in favor of plaintiff wife would have entitled her to relief, and the submission of those three possibilities to the jury in a single issue would have been confusing and would have necessitated an exceedingly complicated charge.

17. **Cancellation of Instruments § 6; Fraud § 8— transaction procured by fraud, duress or undue influence — ratification**

While a transaction procured by fraud, duress or undue influence may be ratified by the victim so as to preclude a subsequent suit to set aside the transaction, an act of the victim will not constitute ratification unless, at the time of such act, the victim had full knowledge of the facts and was then capable of acting freely.

18. **Cancellation of Instruments § 6; Fraud § 8— wife's transfer of securities to husband — fraud, duress, undue influence — ratification — insufficiency of evidence**

In the wife's action to set aside a transfer of corporate securities to her estranged husband on grounds of fraud, duress and undue influence, defendant husband's evidence was insufficient to show ratification of the transaction by the wife when she signed a gift tax return prepared by his accountant which reported the transfer as a gift from the wife to the husband, where the husband's evidence disclosed that the wife signed the gift tax return believing she was under compulsion of law to do so and that her refusal to sign would be costly to her.

19. **Cancellation of Instruments § 11; Fraud § 13— failure to instruct on ratification**

In the wife's action to set aside on grounds of fraud, duress and undue influence the transfer to her estranged husband of her interest in corporate securities, there was no error prejudicial to defendant husband in the failure of the trial court to instruct the jury as to his contention that the wife had ratified the transaction where the evidence was insufficient to support a finding of ratification. G.S. 1A-1, Rule 51(a).

20. **Cancellation of Instruments § 11; Fraud § 13— fraud, duress, undue influence — instructions — contentions of defendant**

In the wife's action to set aside her transfer of corporate stock and debentures to her estranged husband, the trial court did not fail in its instructions to apply the facts as contended by defendant to the issues submitted to the jury as to whether the wife's endorsements of the securities were obtained by fraud, duress or undue influence.

On *certiorari* to the Court of Appeals to review its decision, reported in 9 N.C. App. 135, 175 S.E. 2d 735, granting a new trial upon appeal by the defendant to it from *Anglin, J.,* at the 12 January 1970 Schedule "C" Civil Session of MECKLENBURG. This case was docketed and argued as No. 59 at the Fall Term 1970.

Plaintiff and defendant were married in 1948. They lived together until 2 December 1967, when he left home following a discussion, in the course of which, according to his allegation and testimony, she informed him she had been guilty of adultery. Their three children were then 15, 13 and 10 years of age, respectively. She instituted this action to have declared void assignments by her to him of 147½ shares of common stock of Royal Crown Bottling Company of Charlotte and of three 5% debentures of the Royal Crown Bottling Company of Houston, Texas, in the amount of $1,000 each. She alleges that the assignments were obtained by fraud, duress and undue influence. It is alleged and admitted that the defendant was, and is, an experienced business man and that the plaintiff, while well educated, had no business experience.

The stock in question is a one-half interest in 295 shares given to the plaintiff and the defendant by his parents, the stock certificates, dated 12 May 1966, being issued to "James Cole Link and Blythe Link as joint tenants with rights of survival." The printed transfer form on the back of each certificate was signed by the plaintiff. It is dated December 30, 1967, and purports to be a transfer by her to the defendant of all her interest in and to the shares represented by the certificates. Other than her signature, the entire transfer form, including the date, is either printed or typewritten. The plaintiff testified that she signed it on 18 December 1967, sixteen days after the separation. The defendant testified that she signed it on or about 29 December 1967. He acknowledged that no consideration was paid to the plaintiff for this transfer, testifying that it was a gift from her to him.

The three debentures issued to the plaintiff 3 January 1956, were a gift to her from the defendant's grandfather. On the reverse of each debenture is the signature of the plaintiff. Above this is typed, "This Debenture is transferred, assigned and conveyed to" and beneath that, in a handwriting other than that of the plaintiff, is "James C. Link 12/15/67." This is plaintiff's Exhibit E.

Plaintiff's Exhibit F is entitled "STATEMENT." It consists of a typewritten, unsigned statement, in the name of the plaintiff, certifying that she is the sole owner of the above debentures, which are therein described, and, beneath this, the statement, in the plaintiff's handwriting and signed by her, "I waive all rights to these debentures."

A further document, plaintiff's Exhibit H and defendant's Exhibit I, is a statement, signed by the defendant, certifying that he is the owner of the above described debentures transferred to him by the plaintiff on December 15, 1967.

The plaintiff alleges that the 147½ shares of stock were worth in excess of $75,000 and the debentures were worth in excess of $3,000 when so transferred by her to the defendant. The defendant alleges that the stock was then worth $43,564.13 and the debentures were worth $3,000.

The following issues were submitted to the jury:

"1. Did the defendant procure the plaintiff's endorsement of the stock certificates and the debentures by fraud?

"2. Did the defendant procure the plaintiff's endorsement of the stock certificates and the debentures by duress?

"3. Did the defendant procure the plaintiff's endorsement of the stock certificates and the debentures by undue influence?

"4. Did the plaintiff make a gift to the defendant of:

A. The debentures:

B. The certificates of stock?"

The jury answered each of the first three issues, "Yes." It did not answer the fourth issue, having been instructed by the court not to answer it if they answered any one of the first three issues "Yes." Upon this verdict, the Superior Court entered judgment that the plaintiff and the defendant jointly own the 295 shares of stock and that the plaintiff is the sole owner of the debentures, ordering the defendant to deliver the securities, so endorsed, to the plaintiff, and to pay her interest received by him on the debentures. The defendant's motions for judgment notwithstanding the verdict and for a new trial were denied.

The evidence of the plaintiff, in addition to the above exhibits, was to the following effect:

She has had no experience in dealing in corporate securities, in attending stockholders' meetings or in the preparation of tax returns. The defendant handled the preparation of all their tax returns, she simply signing them as he directed. At the time of

Link v. Link

their separation, she had no property other than these securities, the value of which she did not know, her interest in the home (apparently held by the entireties) and an automobile. She was unemployed and had no income. On 18 December 1967, she learned the defendant had deposited in her bank account $3,000, the proceeds of three other debentures formerly owned by her and sold by him pursuant to her endorsement. (The defendant was then president or manager of the corporation which issued the stock in question and his salary was $50,000.)

Prior to the conversation on 17 November 1967, in which she disclosed her own misconduct, the family situation was deteriorating, the children had gotten into difficulties at school and her purpose was to clear up the domestic problems. In the course of that conversation, the defendant became angry. The following day he told her she could no longer stay in the house. The next day he told her: "I could kill you but that would be too easy. * * * I want you to suffer." He left the home 2 December 1969. She was upset and concerned about being separated from the children and consulted a psychiatrist, becoming his patient.

On 16 December the defendant came to the house and asked the plaintiff to sign over to him her interest in the house and its contents and her interest in the stock. He then told her that, if she did not so transfer the stock to him, he would take the house and the children, but, if she would agree to his "conditions" and would transfer to him her interest in the house and in the stock, he would let her stay in the house with the children until the youngest child reached the age of 20 or married, and would provide $100 a month for the support of each child, but nothing for her other than a car for her use every six years. He told her he had discussed the matter with three lawyers. No agreement was reached that day.

On 18 December the defendant returned to the house with papers, which he instructed the plaintiff to sign "on the dotted line." This she did. She then knew nothing as to the value of the stock or as to the "workings of this business." She did not have an opportunity to examine the stock certificates, which she had never seen before, and did not know how many shares the certificates represented. She was nervous, tired and desperate. At the same time, she signed the above mentioned waiver of her rights in the three debentures, her recollection being that she

wrote this waiver on a blank sheet of paper. She does not recall the unsigned typed statement now appearing above this waiver on Plaintiff's Exhibit F. She does not recall whether she put her signature on the reverse of the three debentures, but if she was instructed to do so she did. At the time she signed these documents she had consulted no attorney. The defendant did not suggest that she do so and did not tell her the value of the stock. There was no conversation about her making a gift to the defendant. Her reason for signing was that she was "meeting a demand." She learned about the value of the stock at a hearing concerning support, held in October 1968.

In April 1968, just prior to the deadline for filing them, the defendant brought to her some 1967 tax returns for her signature. Her attorney was out of town. The defendant told her that if she did not sign the returns there would be a penalty which she could not afford to pay, so she had better sign, which she did, not knowing one was a gift tax return which reported the stock transfer as a gift from her to the defendant. The defendant did not go over the return with her. She was not consulted about its preparation and gave no information to the person who prepared it.

(This gift tax return, dated April 11, 1968, Plaintiff's Exhibit A, showed a gift by her to the defendant of the stock and debentures and stated the stock had a book value of $43,564.13 and the debentures a face value of $3,000. Apparently, the defendant had this return prepared to correct an error as to the marital deduction made in the preparation, by his representatives of an earlier gift tax return, Plaintiff's Exhibit G, the record copy of which shows no date and no signature by the plaintiff. The defendant testified the plaintiff signed the first return in February 1968.)

She is a graduate of the University of Illinois and read the letter from her father-in-law telling of his gift of the stock to her and the defendant jointly, but she did not understand the explanation therein of the procedure followed by him in making that gift (a somewhat complex series of transactions designed to minimize or eliminate the father-in-law's gift tax liability).

The defendant's evidence was to the following effect:

He is the manager of the corporation which issued the stock in question. The stock was given to him and the plaintiff by his

father, whose letter of transmittal in 1966 explained how the gift was being handled due to the gift tax liability of the donor. He and the plaintiff discussed it at that time, including the then value of the stock.

When the plaintiff informed him on 17 November 1967 of her misconduct, he was shocked. On 2 December 1967, he moved from the house. On 5 December 1967, he took the three debentures, together with three others, issued by another corporation and also given to the plaintiff by his father or grandfather, all of which he had been keeping in his lock box, to the house and, in the presence of the plaintiff's father who was visiting her there, he explained that his uncle wanted to buy some debentures. The plaintiff then endorsed all six debentures.

His uncle purchased the other three debentures but not the three here in question. The proceeds of that sale ($3,000) he deposited in the plaintiff's bank account on 18 December 1967. On that date, he went to the house to see the plaintiff and explained to her what he had done. He then also told her that the new owners of the Houston Company (issuer of the debentures here in question) required a statement as to who then owned these debentures and, therefore, she would have to sign the statement on Plaintiff's Exhibit F that she owned them. Thereupon, the plaintiff stated she wanted nothing to do with the debentures and proceeded to write out and sign the above mentioned waiver of all her interest in them. The defendant reported this to his father, who, upon learning the plaintiff had previously endorsed the debentures in anticipation of the above mentioned sale to the defendant's uncle, advised the defendant to send them to him and "they" would transfer the debentures to the defendant "as someone had to own them." Plaintiff never made any complaint to the defendant concerning the debentures prior to her testimony at the present trial.

On 29 December 1967, he went to see the plaintiff about the stock. He told her, "This is the stock that my parents gave the two of us and I think I should own it." She replied: "I don't want any part of your old company. Here, let me have it and I will sign it." Thereupon, she signed the certificates, which were duly sent by him for transfer on the company's books. Subsequently, he put the stock in a trust fund for the children, which trust he has power to revoke.

In April 1968, he carried the gift tax return, Plaintiff's Exhibit A, which he had employed an accountant to prepare, to the plaintiff. This return showed no gift tax was due. At the same time, he took to her the income tax returns which he had caused to be prepared. He went over these with her and explained the advantage of a joint income tax return, including a resulting refund, half of which he agreed to and did pay over to her. The plaintiff signed the returns without objection after examing them. She had previously signed a gift tax return, prepared by his representatives, in which there was an error concerning the marital deduction.

His income at the time of the separation and the transfer of the securities was $50,000 per year. At the time of the trial, he lived in the home with the two boys and the plaintiff had an apartment elsewhere.

*Bradley, DeLaney and Millette by Ernest DeLaney, Jr., for plaintiff appellant.*

*Warren C. Stack for defendant appellee.*

LAKE, Justice.

The Court of Appeals concluded that the Superior Court erred in: (1) Submitting the four issues to the jury instead of a single issue, "Did the defendant procure the plaintiff's endorsement of the stock certificates and the debentures by fraud?"; and (2) in not applying "the facts as contended by the defendant to the first three issues in the charge to the jury." In both of these conclusions, it is our opinion that the Court of Appeals was in error.

[1, 2] It is the duty of the trial judge to submit to the jury such issues as are necessary to settle the material controversies raised in the pleadings. *Johnson v. Lamb,* 273 N.C. 701, 161 S.E. 2d 131; *Heating Co. v. Construction Co.,* 268 N.C. 23, 149 S.E. 2d 625; *Stanback v. Haywood,* 209 N.C. 798, 184 S.E. 831; *Tucker v. Satterthwaite,* 120 N.C. 118, 27 S.E. 45. Rule 49(b) of the Rules of Civil Procedure provides, "Issues shall be framed in concise and direct terms, and prolixity and confusion must be avoided by not having too many issues." Nevertheless, the form and number of issues to be submitted is a matter which rests in the sound discretion of the trial judge, assuming that the issue is raised by the pleadings, liberally construed. *Rubber*

*Co. v. Distributors,* 253 N.C. 459, 117 S.E. 2d 479; *Lumber Co. v. Construction Co.,* 249 N.C. 680, 107 S.E. 2d 538; *O'Briant v. O'Briant,* 239 N.C. 101, 79 S.E. 2d 252; *Griffin v. Insurance Co.,* 225 N.C. 684, 36 S.E. 2d 225.

[3]    The complaint in the present action alleges, and the answer denies, that the defendant induced the plaintiff to transfer to him the securities in question by fraudulent concealment and that he "coerced" and "extracted" her signature to the transfers by threats and abuse. The allegations of the complaint are sufficient to justify the submission to the jury of the questions of fraud, duress and undue influence.

[4, 5]    These are related wrongs and, to some degree, overlap. See: *Joyner v. Joyner,* 264 N.C. 27, 140 S.E. 2d 714; *In re Will of Franks,* 231 N.C. 252, 260, 56 S.E. 2d 668; *Little v. Bank,* 187 N.C. 1, 121 S.E. 185. They are, however, not synonomous. Proof of facts sufficient to show one does not necessarily constitute proof of either of the other two. Fraud rests upon deception by misrepresentation or concealment. Duress is the result of coercion. It may exist even though the victim is fully aware of all facts material to his or her decision. Undue influence may exist where there is no misrepresentation or concealment of a fact and the pressure applied to procure the victim's ostensible consent to the transaction falls short of duress. See, *Edwards v. Bowden,* 107 N.C. 58, 12 S.E. 58.

The plaintiff alleged and offered evidence tending to show that she was inexperienced in matters of corporate securities and finance and that, throughout the marriage, she had relied upon the defendant to handle the family business affairs, habitually signing without question documents, such as tax returns, prepared under his direction and presented to her by him for signature. She alleged and offered evidence tending to show the defendant was an experienced business man and the president of the corporation which issued the stock in question. Her evidence further tends to show that, when the defendant requested her to sign the transfer forms on the reverse of the stock certificates, she knew nothing about the value of the stock and the defendant did not advise her concerning its value or suggest that she procure the advice of an attorney. The defendant offered evidence tending to show that, when the stock was given to them by his father, the defendant explained the transaction and the value of the stock to the plaintiff.

As to the debentures, the defendant's evidence tends to show that the plaintiff's endorsements on the debentures were not intended to transfer them to him but were for the purpose of enabling him, as the plaintiff's agent, to sell them to his uncle. The plaintiff's testimony as to the debentures was that, at the time she signed the separate paper on which, above her signature, she wrote, "I waive all rights to these debentures," she did not understand the nature of debentures or "the workings of this business," and had not had any legal advice with reference to the effect of signing such a document.

The defendant's further testimony in relation to the debentures was to the effect that he explained their significance to the plaintiff when his grandfather gave them to her, eleven years prior to her alleged transfer to him. He testified that when he took these three endorsed debentures back to the plaintiff, following his failure to sell them to his uncle, he informed the plaintiff that the new owners of the issuing company needed to know who owned the debentures, so it was necessary for her to sign a statement, as to each debenture, that she owned it. Thereupon, the plaintiff stated that she did not want anything to do with the debentures and signed the waiver of her right therein. He testified that on that occasion he told the plaintiff the debentures were worth $3,000. At a later date his name was put on the debentures by his father as the transferee thereof.

[6, 7]   Where a transferee of property stands in a confidential or fiduciary relationship to the transferor, it is the duty of the transferee to exercise the utmost good faith in the transaction and to disclose to the transferor all material facts relating thereto and his failure to do so constitutes fraud. *Vail v. Vail,* 233 N.C. 109, 63 S.E. 2d 202. Such a relationship "exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Abbitt v. Gregory,* 201 N.C. 577, 598, 160 S.E. 896. Intent to deceive is not an essential element of such constructive fraud. *Miller v. Bank,* 234 N.C. 309, 67 S.E. 2d 362. Any transaction between persons so situated is "watched with extreme jealousy and solicitude; and if there is found the slightest trace of undue influence or unfair advantage, redress will be given to the injured party." *Rhodes v. Jones,* 232 N.C. 547, 61 S.E. 2d 725.

Link v. Link

[8, 9]   As Justice Sharp said in *Eubanks v. Eubanks,* 273 N.C. 189, 159 S.E. 2d 562, "The relationship between husband and wife is the most confidential of all relationships, and transactions between them, to be valid, must be fair and reasonable." In that case, the transaction in question was a separation agreement between the parties to a collapsing marriage. Thus, the fact that the transactions here in question occurred after the defendant's departure from the home, following the disclosure by the plaintiff of her misconduct, did not show the previously established confidential relationship between them had terminated so as to free the defendant to deal with the plaintiff as if they were strangers.

[10]   In addition to the husband-and-wife relationship, the defendant was the president or manager of the corporation whose stock was being transferred and so had full information of its value. He knew that the plaintiff had neither such information nor general understanding of corporate securities. For a discussion of authorities in other jurisdiction relating to the existence of a duty of disclosure resting upon a director who purchases, from another stockholder, stock in his corporation, see, "The Use for Personal Profit of Knowledge Gained While a Director," 9 Miss. Law Journal 427, 439-454. In *Abbitt v. Gregory, supra,* this Court found it unnecessary to decide whether the circumstance that the purchaser was the general manager of the issuing corporation was sufficient, standing alone, to prove the existence of a fiduciary relationship between him and the selling stockholder with respect to a transfer of stock. When, as here, there are added the further circumstances that the transferor is the wife of the transferee, she is inexperienced in business affairs and is laboring under great emotional strain, the stock is unlisted, is closely held within the family of the transferee and has never paid dividends, the duty of disclosure is clear.

In view of the conflict in the evidence, the jury could have found that the plaintiff knew the value of the stock and understood the nature and value of the debentures issued by the second corporation so that there was no fraudulent concealment of any material fact. Even so, the plaintiff would, nevertheless, be entitled to relief if, as she alleged and testified, the transfer of the securities was the result of duress. Her testimony was to the effect that she signed the documents in question, because the defendant told her that, unless she did so, he would put her out of the house and take the children, but, if she transferred these

properties to him, he would permit her to continue to live in the home with the children and would make payments to her for their support.

[11, 12]  It has been said, "Duress exists where one, by the *unlawful* act of another, is induced to make a contract or perform or forego some act under circumstances which deprive him of the exercise of free will." (Emphasis added.) See, *Smithwick v. Whitley*, 152 N.C. 369, 67 S.E. 913, quoted in *Joyner v. Joyner, supra*. Unquestionably, an essential element of duress is a *wrongful* act or threat. Restatement of the Law, Contracts, § 492; Williston on Contracts, 3d Ed., § 1606; 25 Am. Jur. 2d, Duress and Undue Influence, §§ 1 and 3. Ordinarily, it is not wrongful and, therefore, not duress for one to procure a transfer of property by stating in the negotiations therefor that, unless the transfer is made, he intends to institute or press legal proceedings to enforce a right which he believes, in good faith, that he has. See: *Bank v. Smith*, 193 N.C. 141, 136 S.E. 358; *Edwards v. Bowden, supra;* 25 Am. Jur. 2d, Duress and Undue Influence, §§ 14, 16 and 18; Williston on Contracts, 3d Ed., § 1606. To hold otherwise would make it impossible to settle lawsuits. The law with reference to duress has, however, undergone an evolution favorable to the victim of oppressive action or threats. The weight of modern authority supports the rule, which we here adopt, that the act done or threatened may be wrongful even though not unlawful, *per se;* and that the threat to institute legal proceedings, criminal or civil, which might be justifiable, *per se,* becomes wrongful, within the meaning of this rule, if made with the corrupt intent to coerce a transaction grossly unfair to the victim and not related to the subject of such proceedings. *Fowler v. Mumford*, 48 Del. 282, 102 A. 2d 535; *Coleman v. Crescent Insulated Wire & Cable Co.*, 350 Mo. 781, 168 S.W. 2d 1060; *Hochman v. Zigler's, Inc.*, 139 N.J. Eq. 139, 50 A. 2d 97; *Miller v. Eisele*, 111 N.J.L. 268, 168 A. 426; *Adams v. Irving Nat. Bank*, 116 N.Y. 606, 23 N.E. 7; *Hogan v. Leeper*, 37 Okla. 655, 133 P. 190; *Fox v. Piercey*, 119 Utah 367, 227 P. 2d 763; Restatement of the Law, Contracts, § 492 (g) ; Williston on Contracts, 3d Ed., § 1607; 25 Am. Jur. 2d, Duress and Undue Influence, §§ 12, 16.

[13]  The above cited section of the Restatement says: "[A]cts that involve abuse of legal remedies or that are wrongful in a moral sense, if made use of a means of causing fear, vitiate a transaction induced by that fear, though they may not in themselves be legal wrongs." Professor Williston says, in section 1607

of his treatise, "[M]eans in themselves lawful, may be used so oppressively as to constitute an abuse of legal remedies. * * * [I]t is not duress to threaten or make *good faith* use of legal processes available or the remedies prescribed under a contract. But where a threat of civil action or use of an available remedy is made *only* for the purposes of extortion duress may be found." Thus, where a transaction is brought about by the use of threats to take action, not wrongful *per se,* the presence or absence of duress depends upon the totality of the circumstances.

**[14]** An announcement by a husband, to whom the wife has confessed her adultery, that he intends to separate from her and to institute legal proceedings to obtain the sole custody of their children would not, *per se,* constitute duress when the transaction induced by such statement of intent was the execution of a separation and custody agreement. See, *Joyner v. Joyner, supra.* The situation is completely different, however, when the threat to take the children from the wife is for the purpose of coercing her into transferring, without consideration, her individual property to the husband, the proposal being to leave the children in her custody if she make such transfer. Thus, in the present case, there was evidence to support a finding of duress, even if the jury had found that there was no concealment of facts justifying a finding of fraud.

**[15]** Upon the evidence of the defendant, however, the jury could have found there was no threat sufficient to constitute duress. Notwithstanding such a finding, it could also have found the presence of undue influence, which was alleged in the complaint. In *Edwards v. Bowden, supra,* this Court quoted with approval the following statements from Pollock on Contracts and Pomeroy on Equity Jurisprudence:

> "In equity there is no rule defining inflexibly what kind or what amount of compulsion shall be sufficient ground for avoiding a transaction. * * * The question to be decided in each case is whether the party was a free and voluntary agent. Any influence brought to bear upon a person entering into an agreement or consenting to a disposal of property, which, having regard to the age, capacity of the party, the nature of the transaction, and all the circumstances of the case, appears to have been such as to preclude the exercise of free and deliberate judgment, is considered by courts of equity to be undue influence, and is

a ground for setting aside the act procured by its employment." Pollock on Contracts, 524.

"Where there is no coercion amounting to duress, but a transaction is the result of a *moral, social* or *domestic* force exerted upon a party, controlling the free action of his will and preventing any true consent, equity may relieve against the transaction on the ground of undue influence, even though there may be no invalidity at law. In the vast majority of instances, undue influence naturally has a field to work upon in the conditions or circumstances of the person influenced, which renders him peculiarly susceptible and yielding; his dependent or fiduciary relation towards the one exerting the influence, his mental or physical weakness, his pecuniary necessities, his ignorance, lack of advice, and the like." Pomeroy, Equity Jurisprudence, 951.

[16] In view of the complex circumstances of this case, to submit to the jury in a single issue these several possibilities of constructive fraud, duress and undue influence would have been confusing and would have necessitated an exceedingly complicated charge. We see no abuse of the trial court's discretion in the submission of the three separate issues on fraud, duress and undue influence. While, upon the evidence in the record, the jury might have answered any, or all of these issues in favor of the defendant, an answer of any of the three in favor of the plaintiff would have entitled her to relief and the jury answered all three in her favor. There is nothing in the record to indicate that the jury was confused by the submission of the three separate issues.

We concur in the conclusion of the Court of Appeals that the trial judge "gave full instruction as to the applicable law" concerning these three bases for granting the plaintiff relief from this alleged gift of her entire separate property to her husband, who had announced his intention of leaving her without providing for her support.

The second ground for the decision of the Court of Appeals is, in our opinion, equally untenable. While it is not entirely clear from the answer that the defendant intended to plead the plaintiff's execution of the gift tax return as a ratification by her of the transaction, as distinguished from a mere pleading of evidence supporting his contention that she intended, at the time of the transaction, to make a gift to him, we interpret the plead-

ing, most favorably to him, as an allegation of such ratification. However, the record does not contain evidence which would support a finding of ratification.

[17] It is elementary that a transaction procured by either fraud, duress or undue influence may be ratified by the victim so as to preclude a subsequent suit to set the transaction aside. *May v. Loomis,* 140 N.C. 350, 52 S.E. 728; 25 Am. Jur. 2d, Duress and Undue Influence, §§ 28 and 41. It is equally clear, however, that an act of the victim of any of these wrongs will not constitute a ratification of the transaction thereby induced unless, at the time of such act, the victim had full knowledge of the facts and was then capable of acting freely. 25 Am. Jur. 2d, Duress and Undue Influence, §§ 28, 29 and 41; Annot., 77 A.L.R. 2d 426, 431 and 446.

[18] The only act of the plaintiff, relied upon by the defendant to show ratification of the transfer of the securities to him, was her signing of a gift tax return, prepared without her knowledge by his accountant and brought to her by him for her signature, along with a joint income tax return, similarly prepared. The defendant testified that these returns were presented by him to the plaintiff for her signature shortly before the deadline for filing such returns and less than four months after the transfer of the securities. The defendant further testified that, at the time of the plaintiff's execution of these returns, he told her that if she signed the returns so presented to her, there would be no gift tax due from her, but "if she filed a gift tax return on an individual basis [*i.e.,* if she did not sign the return so presented by him to her], then there would be $669.04 due to be paid by her to the government." In the same conversation, he presented the joint income tax return for her signature, telling her that, if she joined in signing it, there would be a substantial refund, one-half of which he would give to her. She was then represented by counsel but her counsel was out of the city and could not be reached by her, which circumstance the defendant knew. There is nothing in the record to indicate that the defendant's threat to take the children from her custody if she did not acquiesce in the transfer of the securities to him had been modified. The plaintiff testified that when the defendant presented these tax returns to her, he informed her that if she did not sign the gift tax return, she would be liable for a penalty which she could not afford to

pay. The defendant denied making this statement. Taking the defendant's evidence at its full face value, it is not sufficient to support a finding of ratification of the transaction in question by the plaintiff. Clearly, she signed the tax return believing she was under compulsion of law to do so and her refusal to sign would be costly to her.

[19]    There being no evidence to support a finding of ratification, there was no error prejudicial to the defendant in the failure of the trial court to instruct the jury as to the defendant's contention with respect thereto. The duty of the judge is to declare the law *arising on the evidence* and to explain the application of the law thereto. Rule 51 (a) of the Rules of Civil Procedure; *Westmoreland v. Gregory,* 255 N.C. 172, 120 S.E. 2d 523. The trial court, in the charge to the jury, reviewed with substantial accuracy the evidence of both parties concerning the transactions under attack and the signing of the tax return. On each of the issues of fraud, duress and undue influence, the court instructed the jury correctly as to the law with reference to such wrong and as to the facts which they must find in order to answer such issue "Yes," and that if they did not find such facts, they would answer such issue "No." With reference to the issues of fraud and duress, the judge further instructed the jury that if they found that the plaintiff would have made the transfer of the securities, regardless of their nature and value, they would answer such issue "No." By inadvertence, no doubt, this instruction was not given with reference to the issue of undue influence, but in view of the affirmative answers to the issues of fraud and duress this cannot be deemed an error prejudicial to the defendant, since such answers to those issues entitled the plaintiff to the judgment which was rendered.

[20]    The court further instructed the jury correctly as to the law of gifts and that if they answered the issues of fraud, duress and undue influence in the negative, they would then consider the fourth issue, which was whether the plaintiff had made a gift to the defendant of the debentures and the *stock certificates,* requiring, in that event, a separate answer as to each type of security. In this connection, the court instructed the jury correctly as to the facts which it must find, as to each type of security considered separately, in order to answer the fourth issue "Yes," and that if the jury did not so find, it would answer such issue "No." We do not find in the charge

any failure to apply the facts as contended by the defendant to the several issues submitted to the jury.

The judgment of the Court of Appeals is, therefore, reversed and this cause is remanded to that court with direction to enter a judgment affirming the judgment of the Superior Court.

Reversed and remanded.