Paradigm Fin. Grp., Inc. v. Church, 2014 NCBC 16.

STATE OF NORTH CAROLINA

COUNTY OF SURRY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
12 CVS 357

PARADIGM FINANCIAL GROUP,
INC.,

          Plaintiff,

     v.

CLAUDE T. CHURCH and
CATHERINE H. CHURCH,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER**

{1}    THIS MATTER is before the court on cross-motions for summary judgment ("Motions") pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Rule(s)"). For the reasons stated below, Plaintiff's Motion is DENIED and Defendants' Motion is DENIED.

>*Blanco Tackabery & Matamoros, P.A. by Peter J. Juran and Toni J. Grace for Plaintiff Paradigm Financial Group, Inc.*

>*Tuggle Duggins, P.A. by Denis E. Jacobson, Jeffrey S. Southerland, and Sarah J. Hayward for Defendants.*

Gale, Judge.

## I.   PROCEDURAL HISTORY

{2}    Plaintiff Paradigm Financial Group, Inc. ("Paradigm") initiated this lawsuit on March 14, 2012. The matter was designated a Complex Business Case by Order of Chief Justice Sarah Parker dated April 24, 2012, and assigned to the undersigned on April 25, 2012.

{3}     Plaintiff filed an Amended Complaint on October 1, 2013, bringing a claim for breach of the Marketing and Service Agreement.  On October 29, 2013, Defendants filed their Answer to Amended Complaint and Counterclaims.[1]

{4}     On December 3, 2013, Plaintiff and Defendants filed cross-motions for summary judgment on Plaintiff's breach of contract claim.  The Motions have been fully briefed, the court heard oral argument on February 20, 2014, and the Motions are ripe for disposition.

{5}     There is separate litigation between the parties to the sales contracts on which Paradigm bases its claim for a commission.[2]  Particularly, that case concerns whether Defendants properly terminated those agreements.  For reasons stated below, the court concludes that Paradigm's recovery is not dependent upon the outcome in that litigation.

## II.    PARTIES

{6}     Paradigm is a mergers and acquisitions intermediary firm with an office and principal place of business in Surry County, North Carolina. (Am. Compl. ¶ 1; Answer ¶ 1.)  Paradigm's agent, Mike Scott ("Scott"), served as Defendants' agent in the sale of their business. (Br. Supp. Defs.' Mot. Summ. J. ("Defs. Supp. Br.") 2.)

{7}     Defendants Claude T. Church ("Church") and Catherine H. Church ("Mrs. Church") (collectively "the Churches") are individual citizens and residents of Greensboro, Guilford County, North Carolina. (Am. Compl. ¶ 2; Answer ¶ 2.) Church is the sole owner of United Metal Finishing, Inc. of Greensboro ("UMF"), a metal finishing business located on Blue Bell Road in Greensboro, North Carolina. (Br. Supp. Pl.'s Mot. Summ. J. ("Pl. Supp. Br.") 1–2; Defs. Supp. Br. 2.)  The

---

[1] Plaintiff has separately moved to strike Defendants' Counterclaims under Rule 12(f).  The court has not yet heard argument on this motion and does not address it in this Order.

[2] The separate litigation, *Heron Bay Acquisition, LLC v. United Metal Finishing, Inc.*, No. 12 CVS 5505 (Guilford County) (N.C. Super. Ct.) (hereinafter "the *Heron Bay* case"), is also before this court.

Churches also own the real estate ("the Property") upon which UMF is located. (Pl. Supp. Br. 1–2; Defs. Supp. Br. 2.)

{8}    Heron Bay Acquisition, LLC ("Heron Bay") and Scott Lowrie ("Lowrie") are nonparties who have played significant roles in the transactions between Plaintiff and Defendants.[3]  Until early 2012, Heron Bay was under contract with Defendants to purchase UMF and the Property.  As the sole owner of Heron Bay, (Pl. Supp. Br. 3; Defs. Supp. Br. 3,) Lowrie negotiated the terms of the sale contract with Plaintiff.  (Pl. Supp. Br. 3–4.)

## III.    STATEMENT OF FACTS

{9}    In 2009, the Churches began exploring the possibility of selling UMF and the Property. (Claude T. Church Dep. vol. I 93:9–20, Mar. 8, 2013.)  That fall, they enlisted Scott and Paradigm to assist them with the sale of UMF and the Property. (Am. Compl. ¶ 5; Answer ¶ 5.)

{10}    In September 2009, the Churches entered into a Marketing and Service Agreement ("MSA") with Paradigm. (Am. Compl. ¶ 5; Answer ¶ 5; Defs. Supp. Br. 2, Exhibit A ("MSA").)  Under it, the Churches granted Paradigm the exclusive right to arrange the sale of UMF as their agent. (Am. Compl. ¶ 6; Answer ¶ 6; MSA ¶¶ 1–2.)

### A. <u>Paradigm Procures Heron Bay as a Potential Purchaser</u>

{11}    Late in 2009, Paradigm and Defendants began negotiations with Heron Bay and its representative, Lowrie, for the purchase and sale of UMF and the Property. (Paradigm 30(b)(6) Dep. 142:12–143:1, Mar. 25, 2013.)[4]

{12}    After exchanging information and prospective concerns regarding the environmental condition of the property, Lowrie and Defendants structured a transaction based on the Brownfield Program, sponsored by the North Carolina Department of Natural Resources ("DENR").  (*See, e.g.*, Letter of Intent ¶ 5

---

[3] Heron Bay and Lowrie are involved in the *Heron Bay* case.
[4] Scott testified as Paradigm's Rule 30(b)(6) deponent for this case.

(memorializing the parties' understanding regarding a Brownfield Agreement).) Under this program, the purchaser of contaminated land enters into a Brownfield Agreement with DENR, which absolves the buyer of liability to the state for historic contamination. (Eckard Dep. 36:7–24.) This process typically takes between eighteen to twenty-four (18–24) months from the time a purchaser receives conditional approval of the Brownfield Application. (Eckard Dep. 85:7–10.) In this transaction, a final Brownfield Agreement was a prerequisite to closing. (Lowrie Dep. vol. I 183:1–13, Apr. 25, 2013.)

## B. Defendants Terminate the Purchase Agreements

{13}    On March 9, 2011, DENR conditionally approved Heron Bay's Brownfield Application. (Eckard Dep. 54:20–56:2.) Three months later, Defendants and Heron Bay entered into an Asset Purchase Agreement ("APA") and a Real Estate Purchase Agreement ("RPA") (collectively, "the Purchase Agreements"). (Am. Compl. ¶ 9; Answer ¶ 9.) Under the APA, Church agreed to sell UMF to Heron Bay for $1,200,000; and under the RPA, the Churches agreed to sell the Property to Heron Bay for $600,000. (APA ¶ 1.3.1; RPA ¶ 2.1.) The Purchase Agreements contain a reciprocal termination provision that allowed either party to terminate the transaction if it had not closed by November 1, 2011. (APA ¶ 8.1(a)(iv).)

{14}    Negotiations eventually broke down between Heron Bay and UMF. As of November 1, 2011, the transaction had not been consummated. At that time, Heron Bay had not obtained a final Brownfield Agreement, as a result of which it could not yet obtain the loan proceeds necessary to purchase the Property. (Defs. Supp. Br. 7.) UMF ultimately terminated the Purchase Agreements on February 17, 2012. (Def. Supp. Br. 7.) The court addresses the disputed basis and legitimacy of this termination in the *Heron Bay* case.

{15}    Regardless of the termination's legitimacy, Paradigm contends it is entitled to a commission based on the triggering events of MSA Paragraph 11. Paragraph 11 provides, "[t]he commission described in Paragraph 10 shall be

earned by and payable to Broker, in cash, upon the occurrence of any of the following events[.]" (MSA ¶ 11.) Two of the included events are:

> (C) Broker obtains an offer to purchase the Business upon terms and conditions specified in Paragraph 1 or upon terms and conditions acceptable to Seller from a ready, willing and able prospective purchaser[; or] (D) Seller accepts in writing an offer from a prospective purchaser and Seller then fails to complete the sale of the Business.

(MSA ¶ 11.) Paradigm asserts that the events described in Paragraphs (C) and (D) occurred, entitling it to a commission. Defendants deny that Paradigm is entitled to any commission, because events specified in both Paragraph (C) and (D) require that Heron Bay be ready, willing and able to close.

## C. Calculation of Commission under the MSA

{16} Paragraph 10 of the MSA provides that Paradigm's commission is calculated as follows:

> For services rendered by Broker under this Agreement, Seller shall pay to Broker a commission in cash to a certain percent or percentage of the Sale Price of said Business or Related Business including all forms of owner financing and any assumption of liabilities, such percentage of the Sale Price to be on a scale as follows:
>
> (A) 10% of the first million, 8% of the second million, 6% of the third million, 4% of the fourth million, as described in paragraph 13 below.
>
> (B) In no event shall the commission payable to Broker be less than $125,000 (minimum commission).

(MSA ¶ 10.)

{17} The MSA defines "Sale Price" as "any and all amounts of . . . consideration paid or conveyed to Seller . . . or conveyed by a purchaser in connection with the sale of . . . the Business[.]" (MSA ¶ 13.)

{18} Paradigm claims a commission of $164,000, which it calculated under Paragraph (A) as: "10% of the first million [and] 8% of the second million" of the total contract price: $1,800,000. (Pl. Supp. Br. 4.)

{19}    Defendants argue that Paradigm is not entitled to any commission because it depends upon the "Sale Price," meaning consideration actually paid, which, in this case, is zero because the transaction did not actually close. (Br. Supp. Defs.' Mot. Summ. J. ("Defs. Reply Br.") 2.) Any percentage of zero is zero, so Defendants contend Paradigm has earned no commission.

### D.  Validity of MSA

{20}    Defendants further challenge the MSA's validity.  First, Defendants assert that the Churches' signatures on the MSA were procured by duress. (Answer, Second Affirmative Defense.)  Church testified that he did not understand Paragraph 11 of the MSA at the time that he signed it and that Scott put "a lot of pressure" on him to sign the agreement. (Church Dep. vol. II 169:25–170:11.)

{21}    Second, Defendants argue that Plaintiff is estopped from recovering any commission based on its misrepresentations made to secure Defendants' agreement to the MSA. (Answer, Third Affirmative Defense.)  In particular, Defendants assert that Scott represented that Paradigm would only be entitled to a commission if there was a fully consummated sale. (Answer, Third Affirmative Defense; Church Dep. vol. II 163:24–164:2.)  Defendants contend this representation bars any commission, even if the condition of a ready, willing and able purchaser is not incorporated in Paragraph 11(D).

{22}    Third, Defendants claim Paradigm is estopped from recovering its commission because it was acting as a dual agent. (Answer, Fourth Affirmative Defense.)  Defendants point to Scott's testimony admitting to representing the interests of both Heron Bay and Defendants. (Paradigm 30(b)(6) Dep. 206:5–10.) Plaintiff counters that Scott made this statement in error and corrected it before his deposition was complete. (Pl. Supp. Mot. 16.)  Plaintiff did not attach the section of the deposition where Scott corrected his previous testimony.  (Pl. Supp. Mot. 17.)

Lowrie filed an Affidavit in which he asserts that he knew and understood that Paradigm was the Churches' agent, but not Heron Bay's agent. (Lowrie Aff. ¶ 4.)[5]

## IV.   LEGAL STANDARD

{23}   Summary judgment is proper when the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that no genuine issue as to any material fact exists and that the movant is entitled to judgment as a matter of law.  N.C. R. Civ. P. 56(c); *Andresen v. Progress Energy, Inc.*, 204 N.C. App. 182, 184, 696 S.E.2d 159, 160–61 (2010).

## V.   ANALYSIS

### A. <u>Assuming the Marketing and Service Agreement Is Valid, Paradigm Is Entitled to a Commission under Paragraph 11(D).</u>

{24}   As worded, Paragraph 11(D) entitles Paradigm to its commission once the seller accepts a purchaser's offer in writing and then fails to close the deal. (MSA ¶ 11(D).)  Defendants concede that they accepted Heron Bay's offer in writing and later chose not to complete the transaction.  (Am. Compl. ¶ 9; Answer ¶ 9; Church Dep. vol. II, 253:3–11.)

{25}   Defendants contend that Paragraph 11(D), however, entitles Paradigm to a commission only if the Churches withdrew from a purchase contract without first giving the purchaser the opportunity to complete the transaction.  (Defs.' Br. Opp'n Pl.'s Mot. Summ. J. ("Defs. Opp'n Br.") 7.)   Defendants effectively urge the court to read a "ready, willing and able" requirement into Paragraph 11(D).  (Defs. Opp'n Br. 7 (contending that Paradigm is not entitled to a commission under Paragraph 11(D) because "Heron Bay was never ready, willing, able, or even obligated to close on the transaction[]").)

{26}   Paragraph 11(C) expressly includes the "ready, willing and able" condition.  Omitting the condition from Paragraph 11(D) leads to the opposite conclusion from the one Defendants assert.  "[A]n interpretation which gives a

---

[5] This affidavit was attached to a brief in the separate *Heron Bay* Case, filed on December 2, 2013.

reasonable meaning to all provisions of a contract will be preferred to one which leaves a portion of the writing *useless or superfluous.*" *S. Seeding Serv., Inc. v. W.C. English, Inc.*, 719 S.E.2d 211, 215 (N.C. Ct. App. Dec. 6, 2011) (emphasis added) (quoting *Int'l Paper Co. v. Corporex Constructors, Inc.*, 96 N.C. App. 312, 316, 385 S.E.2d 553, 555–56 (1989)).

{27}    Reading a "ready, willing and able" requirement into Paragraph 11(D) would render the paragraph superfluous, having the same effect as Paragraph 11(C), except additionally requiring that the Churches accept the offer in writing.

{28}    Moreover, Defendants cannot defeat Paradigm's right under the MSA through provisions found in the Purchase Agreements between Heron Bay and Defendants because the MSA does not include or incorporate such conditions. While there is a principle that when a second contract involves the same subject matter as the first, the contracts should be construed together, this principle assumes that the parties to the first contract are also parties to the second contract. *Beau Rivage Plantation, Inc. v. Melex USA, Inc.*, 112 N.C. App. 446, 450–51, 436 S.E.2d 152, 154 (1993)*; see generally, e.g.*, *In re Fortescue*, 75 N.C. App. 127, 330 S.E.2d 219 (1985) (discussing a loan modification agreement and a promissory note).  Even then, "such a construction should not operate to avoid essential contract terms." *Ruffin Woody & Assocs., Inc. v. Pers. Cnty.*, 92 N.C. App. 129, 135, 374 S.E.2d 165, 169 (1988) (holding that a general arbitration clause was essential).

{29}    The principle does not bar Paradigm from asserting its rights under its own separate contract.  Assuming the MSA is an otherwise valid contract, Paragraph 11(D) entitled Paradigm to a commission on February 17, 2012, when the Churches terminated the Purchase Agreements after previously accepting Heron Bay's offer in writing.

## B. Assuming the MSA's Enforceability, Paradigm's Commission Is the Minimum Commission

{30}    "[E]ach and every part of [a] contract must be given effect if this can be done by any fair or reasonable interpretation; and it is only after subjecting [an]

instrument to this controlling principle . . . that a subsequent clause may be rejected as . . . irreconcilable." *Internet E., Inc. v. Duro Commc'ns, Inc.*, 146 N.C. App. 401, 406, 553 S.E.2d 84, 87 (2001) (internal quotations omitted) (determining that an arbitration provision and a forum selection clause did not inherently conflict) (citing *Davis v. Frazier*, 150 N.C. 447, 451, 64 S.E. 200, 201–02 (1909)).

{31} While Defendants correctly contend that the "Sale Price" necessary to calculate the commission under Paragraph 10(A) is zero, the "minimum commission" is not to be calculated as a percentage of the "Sale Price." Paragraph 10(B) states simply that "[i]n no event shall the commission payable to Broker be less than $125,000 (minimum commission)." (MSA ¶ 10(B).)

{32} Read in conjunction with the Paragraph 11's triggering events, Paragraph 10 provides that if Paradigm is entitled to its commission, the commission will be $125,000, unless the "Sale Price" yields a greater commission.

{33} Therefore, assuming the MSA constitutes a valid agreement, Paradigm is entitled to its minimum commission of $125,000.

### C. Enforceability of the Marketing and Service Agreement

#### i. Defendants' Misrepresentation and Duress Defenses Fail

{34} Defendants contend that Scott and Paradigm misrepresented the contents of the contract to the Churches which induced them to sign. (Answer, Third Affirmative Defense.)

{35} Specifically, they assert that Scott "assur[ed] the Churches that Paradigm would receive no commission unless and/or until the business and property were sold." (Defs. Supp. Br. 3.) The assertion suffers from two major defects. First, the uncontroverted evidence shows that the Churches had an opportunity to read the MSA before signing it. Second, the statement unfairly embellishes Church's deposition testimony which is the only support Defendants cite for this proposition. When asked whether Church could recall "any discussion with Mike [Scott] about what events would trigger a commission by Paradigm[,]" Church responded, "[a] total sale of the company." (Claude T. Church Dep. vol. II

163:24–164:2, July 24, 2013.) Church did not testify that Scott assured him that this was the *exclusive* trigger for a right to a commission. Moreover, Church admitted that Scott "didn't tell me something that was not [in the MSA] or was [in the MSA]. I'm not saying he tried to mislead me. We just didn't go into it." (Claude T. Church Dep. vol. II 165:12–19, July 24, 2013.) Mrs. Church testified that she did not talk with Scott "at all" before signing the MSA. (Catherine H. Church Dep. 9:19–21.)

{36} To adequately assert the defense of duress, the claimant must demonstrate: (1) a wrongful act or threat; (2) that induces the claimant to make a contract; and (3) that deprives the claimant of his or her free will. *Radford v. Keith*, 160 N.C. App. 41, 43–45, 584 S.E.2d 815, 817–18 (2004) (citing *Link v. Link*, 278 N.C. 181, 194, 179 S.E.2d 697, 705 (1971)). An act or threat is wrongful if it is "made with the corrupt intent to coerce a transaction grossly unfair to the victim." *Id.* at 44, 584 S.E.2d at 817.

{37} Even when viewed in the Defendants' favor, the evidence in this case does not support finding inducement by misrepresentation or duress. While Church complained that Scott pressured him to sign the MSA, he did not feel that he had to sign it. (Claude T. Church Dep. vol. II, 170:7–16, July 24, 2013.) Church admitted that Scott never threatened to continue "pester[ing]" him if he did not sign the MSA. (Claude T. Church Dep. vol. II, 170:21–23, July 24, 2013.) Mrs. Church testified that Scott did not force her to sign the MSA, nor did she sign it under duress. (Catherine H. Church Dep. 11:24–12:6.) Further, both re-signed the MSA after its initial expiration. (MSA p. 3.)

{38} Construing the evidence in Defendants' favor, the court concludes that that Paradigm is not barred from enforcing the MSA on the grounds of misrepresentation or duress.

ii. **Defendants Have Presented Sufficient Evidence to Raise a Material Factual Issue as to Whether the MSA Is Voidable Because of Scott's Dual Agency**

{39}    Defendants contend that Scott acted as an undisclosed dual agent, representing both Heron Bay's and Defendants' interests.  (Answer Fourth Affirmative Defense; Countercl. ¶¶ 1–6.)

{40}    An agent in a real estate transaction who represents both buyer and seller must fully disclose its dual agency and obtain each party's consent.  *Greene v. Rogers Realty & Auction Co.*, 159 N.C. App. 665, 668, 556 S.E.2d 278, 280 (2003); *BDM Invs. v. Lenhil, Inc.*, 2014 NCBC LEXIS 6, at *26 (N.C. Super. Ct. Mar. 20, 2014).  This court has previously held that a failure to disclose dual agency is potentially actionable through common law claims for breach of fiduciary duty or constructive fraud.  *BDM Invs.*, 2014 NCBC LEXIS 6, at *27.

{41}    Whether dual agency can be raised as a defense to a breach of contract claim remains uncertain.  Other states hold that failure to disclose a dual agency renders a contract voidable.  *See, e.g.*, *Remediation Servs., Inc. v. Ga.-Pac. Corp.*, 433 S.E.2d 631, 634 (1993); *Whalen v. Bistes*, 45 So. 3d 290, 294 (Miss. Ct. App. 2010) (holding the defendant had the right to void the contract based on the undisclosed agency "regardless of whether the principal suffered an actual injury[]") (citing 3 Am. Jur. 2d. *Agency* § 238 (2002)).  In Mississippi, even where parties do not void a contract on the basis of undisclosed dual agency, the real estate agent cannot recover a commission from either party to the transaction.  *Whalen*, 45 So. 3d at 294 (citing 101 Am. Jur. *Trials* § 8 (2006)).

{42}    The court need not decide whether this authority is persuasive in ruling on these Motions.  The court must first resolve the factual dispute regarding whether Scott actually acted as a dual agent.

{43}    Scott testified as follows:

Q.    Who did you represent in this transaction?
A.    I represented Claude as the seller.  I—I actually represented Scott [Lowrie] also as a—on the buy side.
Q.    You did? You represented both of them?
A.    Yeah.

Q.    Did you ever tell Claude Church that?
A.    I told Claude that we—primarily—you know, we represent him
as a seller, but also I have a duty to represent information—material
information, especially in real estate, to Scott, and actually it makes
the process move forward faster and to Mr. Church's benefit.

(Paradigm 30(b)(6) Dep. 206:5–17.)  Scott testified that he informed Church about the duties he would have to any buyers "[a]t the signing of the contract."  (Scott Dep. 208:19.)  Plaintiff contends that Scott made these statements in error, and corrected them before completion of the same deposition.  (Pl. Supp. Br. 16–17 (citing Paradigm 30(b)(6) Dep. 211:24–213:13).)[6]  In his Affidavit, Scott maintains that he acted solely as the Churches' agent in the transaction; but admits that he was, "to some extent, working on behalf of both the buyer and the seller in an effort to get approval and assistance from third parties."  (Scott Aff. ¶ 15.)

{44}    If a dual agency actually existed, there is no evidence that Scott disclosed it to the Churches in writing.  (Paradigm 30(b)(6) Dep. 208:12–16.)  Defendants contend that Scott did not disclose his dual agency at all.  (Countercl. ¶ 5 ("Plaintiff, *without Defendants' knowledge or consent*, blatantly and willfully . . . act[ed] as a dual agent") (emphasis added).)  However, Church testified that he had no reason to think that Scott was not a "straight shooter" or had ever lied to him.  (Claude T. Church Dep. vol. II, 195:11–23, July 24, 2013.)  Mrs. Church testified she was not aware that Defendants' Counterclaims made such allegations.  (Catherine H. Church Dep. 14:12–16:7.)

{45}    There are material fact issues regarding (1) whether Scott served as a dual agent in the transaction, and if so, (2) whether he effectively disclosed his dual agency to the Churches and obtained their consent.  If it is determined that Scott was acting as an undisclosed dual agent, the court will then determine whether the MSA is voidable at Defendants' election.  *See Remediation Servs., Inc.*, 433 S.E.2d at 634; *Whalen*, 45 So. 3d at 294.

---

[6] The cited portions of Scott's deposition (211:24–213:13) were not attached to any brief in either this case or the *Heron Bay* case.

## VI.  CONCLUSION

{46}    For the foregoing reasons, Plaintiff's Motion for Summary Judgment is DENIED; and Defendants' Motion for Summary Judgment is DENIED.

IT IS SO ORDERED, this the 7th day of May, 2014.