DILLON, Judge.
 

 *673
 

 *2
 
 Both parties appeal from the order and final judgment of the trial court, awarding Plaintiff $550,762.20.
 

 I. Background
 

 In 2003, Defendant Frederic Fordin formed Millenium 3 Automotive Consultants, LLC ("M3 LLC"). M3 LLC's primary asset was its ongoing development of software called "ASR Pro," which was intended to be marketed to the used car dealership industry. At all relevant times, Defendant Fordin was the majority owner and managing member of M3 LLC.
 

 *3
 
 In 2006, Plaintiff Adam Bickley purchased a 10% interest in M3 LLC for $50,000. Shortly thereafter, however, Plaintiff was sentenced to serve two years in prison after pleading guilty to drug charges.
 

 In October 2008, Defendant Fordin approached Plaintiff, expressing his concern that the conviction would adversely affect M3 LLC's prospects of becoming viable. Defendant Fordin offered to repurchase Plaintiff's 10% interest in M3 LLC for $50,000 in the form of a promissory note. Defendant Fordin drafted a written repurchase agreement (the "2008 Agreement"), telling Plaintiff that "he would bankrupt the company if [Mr. Bickley] didn't sign [the agreement]." Mr. Bickley signed the agreement in October 2008.
 

 In December 2009, Mr. Fordin formed a new company, Defendant ASR Pro, LLC, ("ASRP LLC") and arranged for ASRP LLC to purchase the ASR Pro software from M3 LLC. Every member of M3 LLC was given a minority stake in ASRP LLC.
 

 In 2014, ASRP LLC sold the ASR Pro software to an independent company for approximately $14 million.
 

 In December 2015, Plaintiff filed a complaint seeking damages from Defendants based on Defendant Fordin's actions in procuring Plaintiff's signature on the 2008 Agreement.
 

 The trial court granted Defendants' motion for a directed verdict on Plaintiff's claim for unfair and deceptive trade practice ("UDTP"), but ruled that, as a matter of law, M3 LLC had breached its contract to pay Mr. Bickley $50,000 for his 10% interest in the company. The jury found in favor of Plaintiff on his other claims for fraud, constructive fraud, and breach of fiduciary duty, and awarded $505,000 in damages. The jury declined to award punitive damages.
 

 In its order and final judgment, the trial court awarded Plaintiff a total of $550,762.20. The trial court denied Plaintiff's motion for attorneys' fees. Both parties appealed.
 

 II. Analysis
 

 Defendants contend that the trial court erred in failing to grant directed verdict in their favor on Mr. Bickley's claims for fraud, constructive fraud, and breach of fiduciary duty.
 

 The standard of review of directed verdict is whether the evidence, taken in the light most favorable to the nonmoving party, is sufficient as a matter of law to be submitted to the jury. If there is evidence to support each
 
 *4
 
 element of the nonmoving party's cause of action, then the motion for directed verdict and any subsequent motion for [JNOV] should be denied. ... Whether [a party is] entitled to a directed verdict [ ] is a question of law. We review questions of law
 
 de novo
 
 .
 

 Green v. Freeman
 
 ,
 
 367 N.C. 136
 
 , 140-41,
 
 749 S.E.2d 262
 
 , 267 (2013) (internal marks and citations omitted). Guided by our standard of review, we address each of the parties' arguments in turn.
 

 A. Plaintiff's Appeal
 

 On appeal, Plaintiff challenges the trial court's grant of directed verdict for the Defendants on his UDTP claim, a claim based on Defendant Fordin's representations concerning M3 LLC to induce Plaintiff to sell back his 10% interest in the company. We conclude that the trial court did not err. Specifically, as explained below, the repurchase of an interest in a closely held company from a shareholder does not fall within the scope of the UDTP Act.
 

 The UDTP Act provides, in relevant part, that "[u]nfair methods of competition in or
 
 *674
 
 affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."
 
 N.C. Gen. Stat. § 75-1.1
 
 (2015). Our Supreme Court has observed that the history of the Act indicates that the General Assembly was targeting "unfair and deceptive interactions
 
 between
 
 market participants."
 
 White v. Thompson
 
 ,
 
 364 N.C. 47
 
 , 52,
 
 691 S.E.2d 676
 
 , 679 (2010) (emphasis added). For instance, our Supreme Court has explained:
 

 Essentially, the General Assembly indicated through its original statement of purpose that the Act was designed to achieve fairness in dealings between individual market participants. To accomplish this goal, the General Assembly explained that the Act would regulate two types of interactions in the business setting: (1)
 
 interactions between businesses
 
 , and (2)
 
 interactions between businesses and consumers
 
 .
 

 Id.
 

 (emphasis added);
 
 see also
 

 Bhatti v. Buckland
 
 ,
 
 328 N.C. 240
 
 , 245-46,
 
 400 S.E.2d 440
 
 , 443-44 (1991).
 

 Therefore, as our Supreme Court has observed, "the General Assembly did not intend for the Act's protections to extend to a business's
 
 internal
 
 operations."
 
 White
 
 ,
 
 364 N.C. at 53
 
 ,
 
 691 S.E.2d at 680
 
 (emphasis added). "[T]he Act is not focused on the internal conduct of
 
 *5
 
 individuals within a single market participant, that is, within a single business."
 

 Id.
 

 As a result, any unfair or deceptive conduct contained solely within a single business is not covered by the Act. As the foregoing indicates, [our Supreme] Court has previously determined that the General Assembly did not intend for the Act to intrude into the internal operations of a single market participant.
 

 Id.
 

 Here, as in
 
 Thompson
 
 , the bad acts as alleged "did not occur in ... dealings with [other market participants]."
 

 Id.
 

 Rather, the transaction which forms the basis of Plaintiff's claim under the Act is more appropriately classified as internal conduct between two owners of a single business, M3 LLC. As such, being a transaction confined to M3 LLC, and not involving any other market participant, we hold that the transaction whereby Plaintiff agreed to sell back his 10% interest falls outside the scope of the UDTP Act.
 

 As an alternative reason for our holding, we believe that this transaction is analogous to a securities transaction, which our Supreme Court has repeatedly explained does not fall within the scope of the UDTP Act.
 
 See
 

 HAJMM Co. v. House of Raeford Farms, Inc.
 
 ,
 
 328 N.C. 578
 
 , 594,
 
 403 S.E.2d 483
 
 , 493 (1991). Specifically, our Supreme Court reasoned as follows:
 

 Issuance and redemption of securities are not in this sense business activities. ... Subsequent transfer of securities merely works a change in ownership of the security itself. Again, this is not a business activity of the issuing enterprise. Similarly, retirement of the security by the issuing enterprise simply removes the security from the capital structure. Like issuance and transfer of the security, retirement is not a business activity which the issuing enterprise was organized to conduct.
 

 Securities transactions are related to the creation, transfer, or retirement of capital. Unlike regular purchase and sale of goods, or whatever else the enterprise was organized to do, they are not "business activities" as that term is used in the [UDTP] Act. They are not, therefore, "in or affecting commerce," even under a reasonably broad interpretation of the legislative intent underlying these terms.
 

 Id.
 

 *6
 
 In the present case, it is unclear whether Plaintiff's 10% interest in M3 LLC was technically a "security."
 
 See
 

 N.C. Gen. Stat. § 25-8-103
 
 (c) (2015) (stating that an interest in a limited liability company is not a security unless certain other criteria are met). Notwithstanding, we believe that the reasoning by our Supreme Court in the quote above supports our conclusion that the transaction whereby Plaintiff agreed to sell back his 10% interest in M3 LLC does not fall within the scope of the UDTP Act.
 

 Accordingly, we conclude that the trial court properly granted directed verdict for Defendants on Plaintiff's UDTP claim.
 

 *675
 
 B. Defendants' Cross-Appeal
 

 Defendants contend that the trial court erred in failing to grant Defendants' motions for directed verdict on Plaintiff's fraud claim, constructive fraud claim, and claim for breach of fiduciary duty. These three issues were ultimately submitted to the jury and formed the basis of the jury's verdict.
 

 In considering these claims, we are only concerned with whether, when considered in the light most favorable to Plaintiff, there was enough evidence of each element to warrant submission of the claim to the jury.
 
 See
 

 Green,
 

 367 N.C. at 140-41
 
 ,
 
 749 S.E.2d at 267
 
 . We must accept Plaintiff's evidence as true, and resolve all contradictions, conflicts, and inconsistencies in the evidence in his favor.
 
 Daughtry v. Turnage
 
 ,
 
 295 N.C. 543
 
 , 544,
 
 246 S.E.2d 788
 
 , 789 (1978). Evidence offered by a defendant, when favorable to the plaintiff, is to be considered as well.
 
 Godwin v. Johnson Cotton Co
 
 .,
 
 238 N.C. 627
 
 , 629,
 
 78 S.E.2d 772
 
 , 773 (1953). And "[w]here the question of granting a directed verdict is a close one, the better practice is for the trial judge to reserve his decision on the motion and allow the case to be submitted to the jury."
 
 Manganello v. Permastone, Inc.
 
 ,
 
 291 N.C. 666
 
 , 669-70,
 
 231 S.E.2d 678
 
 , 680 (1977).
 

 For the reasons stated below, we hold that the trial court properly denied Defendants' directed verdict motion as to these claims.
 

 1. Fraud
 

 In regard to Plaintiff's fraud claim, Defendants contend that Plaintiff failed to offer any evidence that Defendant Fordin (1) made a false representation, (2) had any intent to deceive, or (3) that Plaintiff was harmed by Defendant Fordin's representation.
 

 At trial, Plaintiff testified that when Defendant Fordin approached him with the request that he sell his 10% interest in M3 LLC, Defendant
 
 *7
 
 Fordin stated that the value of his shares was "zero dollars" and that Defendant Fordin "would bankrupt the company" if Plaintiff refused to sell. Defendant Fordin contradicted this version of events, testifying that he had no intention of bankrupting the company; rather, he was concerned that the government would seize M3 LLC's assets and he had a potential investor who refused to buy in to M3 LLC unless Plaintiff was no longer part of the organization, due to Plaintiff's criminal drug conviction.
 

 Considered in the light most favorable to Plaintiff, this evidence suggests that Defendant Fordin threatened to bankrupt M3 LLC, although he had no intention of actually doing so, in order to force Plaintiff to relinquish his interest in the company.
 

 Defendants also contend that there is no evidence that Plaintiff was harmed by Defendant Fordin's representations because Mr. Fordin presented evidence that if Plaintiff had remained a shareholder of M3 LLC, the prospective investor would not have invested in the company and the software would not have ultimately been sold for $14 million-rather, Defendants contend that "Mr. Fordin would simply have been forced to dissolve the company and pay existing creditors." However, this is contradicted by Defendant Fordin's testimony that he had no intent to "bankrupt" M3 LLC, Defendants' own evidence that Plaintiff had left the company more than eighteen (18) months before the potential investor bought into M3 LLC, and that Defendant Fordin never disclosed that Plaintiff had been an investor in the company, even in his official report to a CPA in 2010 while preparing tax returns. It was the jury's responsibility to weigh the credibility of all of the testimony and evidence presented at trial.
 
 See
 

 Manganello
 
 ,
 
 291 N.C. at 669-70
 
 ,
 
 231 S.E.2d at 680
 
 . Thus, we conclude that the trial court properly denied Defendant's motion for directed verdict on the issue of fraud.
 

 2. Constructive Fraud and Breach of Fiduciary Duty
 

 "Constructive fraud differs from actual fraud in that it is based on a confidential relationship rather than a specific misrepresentation."
 
 Barger v. McCoy Hillard & Parks
 
 ,
 
 346 N.C. 650
 
 , 666,
 
 488 S.E.2d 215
 
 , 224 (1997) (internal marks omitted). In order to maintain a claim for constructive fraud, a plaintiff must show that "[he] and defendants were in a relation of trust and confidence ... [which] led up to and surrounded the consummation of the transaction in which defendant[s] [are] alleged to have taken advantage
 
 *676
 
 of [their] position of trust to the hurt of [the] plaintiff."
 

 Id.
 

 (internal marks omitted).
 
 *8
 
 "In North Carolina, it is well established that a controlling shareholder owes a fiduciary duty to minority shareholders."
 
 Freese v. Smith
 
 ,
 
 110 N.C. App. 28
 
 , 37,
 
 428 S.E.2d 841
 
 , 847 (1993) (citing
 
 Gaines v. Long Mfg. Co
 
 .,
 
 234 N.C. 340
 
 ,
 
 67 S.E.2d 350
 
 (1951) ).
 

 Where a transferee of property stands in a confidential or fiduciary relationship to the transferor, it is the duty of the transferee to exercise the utmost good faith in the transaction and to disclose to the transferor all material facts relating thereto and his failure to do so constitutes fraud. Such a relationship exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence. Intent to deceive is not an essential element of such constructive fraud.
 

 Link v. Link
 
 ,
 
 278 N.C. 181
 
 , 192,
 
 179 S.E.2d 697
 
 , 704 (1971) (internal marks and citations omitted).
 

 Here, Plaintiff presented evidence that Defendant Fordin owned a controlling interest in M3 LLC and essentially ran the business.
 
 See
 

 id.
 
 at 193,
 
 179 S.E.2d at 704
 
 (discussing the responsibility of a president or manager of a corporation to disclose information of its value when stock is being transferred). Plaintiff also presented evidence that Defendant Fordin controlled the finances of the company, failed to keep detailed records of M3 LLC's finances, and failed to disclose any specific details of M3 LLC's financial situation at the time he requested that Plaintiff sell back his shares in M3 LLC. While Defendant Fordin certainly was not required to disclose that the stock had any value if it in fact did not, Plaintiff presented evidence from which a jury could infer that M3 LLC's value was greater than zero; specifically, that in 2008, M3 LLC's profits had increased drastically despite the fact that Defendant Fordin had increased his personal salary draw from $60,000 to $180,000.
 

 Defendants have maintained that there is no evidence that M3 LLC had any value at the time of the 2008 Agreement; however, this conflict in the evidence is again for the jury to resolve.
 
 See
 
 id.
 

 Accordingly, it was not error for the trial court to deny Defendants' motion for directed verdict on the issues of constructive fraud and breach of fiduciary duty.
 

 C. Verdict
 

 Defendants challenge the amount of the jury's verdict, alleging that it is an invalid "compromise verdict" because the jury did not consider
 
 *9
 
 the evidence and the instructions from the trial court in arriving at the dollar amount of damages. We disagree.
 

 "A compromise verdict is one in which the jury answers the issues without regard to the pleadings, evidence, contentions of the parties or instructions of the court."
 
 City of Burlington v. Staley
 
 ,
 
 77 N.C. App. 175
 
 , 178,
 
 334 S.E.2d 446
 
 , 450 (1985). Defendants request a new trial arguing no evidence supports the jury's calculation of damages of $505,000 because this figure is the numerical average between what the Plaintiff sought and Defendant offered. Mr. Fordin conceded he owed approximately $70,000 on his contract with Plaintiff. Plaintiff's forensic accountant testified, that if Plaintiff remained with the company, Plaintiff would have likely received close to $940,000. Defendants contend the jury simply split the difference between those two numbers instead of awarding a sum based upon the evidence. The $505,000 verdict equals the average of $70,000 and $940,000.
 

 Under North Carolina law, the dollar amount of the verdict alone is insufficient to establish an unlawful compromise verdict.
 
 Piedmont Triad Reg'l Water Auth. v. Lamb,
 

 150 N.C. App. 594
 
 , 598,
 
 564 S.E.2d 71
 
 , 74 (2002). Because a juror cannot give testimony to impeach a verdict, establishing a quotient verdict is difficult to prove.
 
 See
 
 N.C. R. Evid. 606(b). Furthermore, the presumption of regularity attaches to judicial acts, including verdicts. Without other evidence to rebut this presumption, this Court presumes the jury followed its instructions.
 
 See generally
 

 State v. Elkerson
 
 ,
 
 304 N.C. 658
 
 , 664,
 
 285 S.E.2d 784
 
 , 789 (1982).
 

 Defendant cites one case where the Supreme Court found an improper verdict based on a series of multiple verdicts each
 
 *677
 
 representing 30% of the damage amount requested.
 
 Daniel v. Belhaven
 
 ,
 
 189 N.C. 181
 
 ,
 
 126 S.E. 421
 
 (1925). The jury in this case "adopted a general rule to give each plaintiff thirty per cent. [sic] of the amount each claimed in his complaint."
 
 Id.
 
 at 182,
 
 126 S.E. at 422
 
 . This was evidenced by a note in the verdict sheet's margin where a juror wrote, "The jury agrees that each man shall be paid 30 per cent. of his claim."
 
 Id.
 
 at 182,
 
 126 S.E. at 421
 
 . Here, the North Carolina Supreme Court found the jurors were not "governed by the proper exercise of judgment under the fixed rules of law," since the verdict was "arbitrary" and was not a valid consideration "in light of the evidence."
 
 Id.
 
 at 182,
 
 126 S.E. at 422
 
 .
 

 Defendants also cite
 
 Shaver v. Monroe Construction Co.
 
 ,
 
 63 N.C. App. 605
 
 ,
 
 306 S.E.2d 519
 
 (1983). In that case, a former employee sued his former employer for the employer's alleged misrepresentation that the company pension plan was still in effect, which induced the employee
 
 *10
 
 to stay with the company and forgo salary increases and bonuses.
 

 Id.
 

 at 606
 
 ,
 
 306 S.E.2d at 521
 
 . The trial court instructed the jury on two different measures of damages.
 

 Id.
 

 at 615
 
 ,
 
 306 S.E.2d at 526
 
 . The trial court also instructed the jury to choose only one of those measures of damages, but not both or a combination of both.
 

 Id.
 

 at 615
 
 ,
 
 306 S.E.2d at 526
 
 . The first measure was the "difference in the value of plaintiff's services during the time that he worked under the fraudulent inducement and the price he was actually paid for his services because of the deceit."
 

 Id.
 

 at 615
 
 ,
 
 306 S.E.2d at 526
 
 . The second measure of damages was the benefit of the bargain.
 

 Id.
 

 at 615
 
 ,
 
 306 S.E.2d at 526
 
 . The benefit of the bargain damages equaled "the difference between the amount that would have been distributed to plaintiff had continuous contributions been made to the plan and the amount which was actually distributed to him."
 

 Id.
 

 at 615
 
 ,
 
 306 S.E.2d at 526
 
 . This Court determined the trial court erroneously submitted the first measure of damages to the jury.
 

 Id.
 

 at 615
 
 ,
 
 306 S.E.2d at 526
 
 . This Court reasoned:
 

 What plaintiff lost as a result of the misrepresentations was the amount of the contributions which supposedly were being made. To allow plaintiff to recover the difference between the value of his services and his salary at the Company would be to allow him a windfall and would be contrary to the underlying principles of compensatory damages.
 

 Id.
 

 at 615-16
 
 ,
 
 306 S.E.2d at 526
 
 .
 

 In the current action, neither party, nor the trial court, gave the jury any specific instructions regarding damages. Rather the trial court gave the jury general instructions on damages:
 
 [1]
 

 As you know, we are-we are trying a case in which the Plaintiff seeks to recover money damages resulting from the diversion of the Plaintiff's equity interest in M3 today.
 

 ....
 

 Seven: What amount is the Plaintiff entitled to recover from the Defendant as damages? If you answered issue two yes, answer issue seven. If you answered issue three yes and four no, answer issue seven. If you answered issue five yes and answered six no, answer issue seven.
 

 Otherwise, stop and inform the Bailiff.
 

 *11
 

 ....
 

 I will discuss these issues one at a time and explain the law which you should consider as you deliberate upon your verdict.
 

 ....
 

 Six, that the Plaintiff suffered damages proximately caused by the Defendant's false representations or concealment. Proximate cause is a cause that's a natural and continuous sequence producing the person's damage and is a cause that any reasonable and prudent person couldn't have seen, would probably produce such damage or some similar injurious results. There may be more than one proximate cause of damage, therefore the Plaintiff need not prove that the Defendants' false representation or concealment was the sole proximate cause of the Plaintiff's damages. The Plaintiff must prove, by the greater weight of the evidence, only that the Defendants' false representation or concealment was a proximate cause.
 

 ....
 

 *678
 
 The next issue is the damage issue. It reads as follows: What amount is the Plaintiff entitled to recover from the Defendant as damages, exclusive of the contract damages? If you answer issue two yes, answer-answer issue seven. Issue seven is the damage issue. If you answer issue three yes and four no, answer issue seven. If you answer issue five yes and issue six no, answer the issue seven. Otherwise, stop and inform the Bailiff.
 

 ....
 

 Now, members of the jury, you've heard the evidence and the argument of counsel. If your recollection of the evidence differs from that of the attorneys, you are, as I told you, to be guided exclusively by your recollection. It is your duty to recall the evidence (inaudible) your attention or not.
 

 You should consider all the evidence, the arguments, contingents, and positions urged by the attorneys and any other contingents that arises from the evidence.
 

 *12
 
 Our review of the record indicates the jury received no special instruction from the trial court on how to measure damages. Rather, the jury was to weigh the evidence and compensate Plaintiff accordingly. The better practice would have been for the parties to ask for a special instruction regarding the benefit of the bargain or restitution damages. This way, the jury would have a better understanding of the remedies available to Plaintiff.
 

 Furthermore, this Court has held "whether plaintiff's [damages] calculation is correct or not is irrelevant since the jury, as the trier of fact, may award damages based on the evidence they find credible and may disregard the evidence they did not find credible."
 
 Dafford v. JP Steakhouse LLC,
 

 210 N.C. App. 678
 
 , 687,
 
 709 S.E.2d 402
 
 , 409 (2011). The jury found Defendants liable for fraud, fraud in the inducement, constructive fraud, and breach of fiduciary duty. Defendants show the jury's verdict represents the average of two sums presented to the jury during trial. However, the jury's single sum alone, without more, under our case law, is insufficient for Defendants to demonstrate that the award of $505,000 to Plaintiff by the jury was an improper exercise of jury discretion and contrary to law.
 

 III. Conclusion
 

 We find no error in the rulings of the trial court on the parties' respective motions for directed verdict. In addition, we find no error in the form or amount of the jury's verdict. Accordingly, we conclude that the parties had a fair trial, free from prejudicial error.
 

 NO ERROR.
 

 Judges HUNTER, JR., and ARROWOOD concur.
 

 [1]
 

 The damages issue was issue #7.