Slattery v. AppyCity, LLC, 2021 NCBC 17.

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 12382

JOHN SLATTERY,

Plaintiff,

v.

APPYCITY, LLC; TIMOTHY S.
FIELDS; MELISSA CRETE; and
DAISY MAE FOWLER a/k/a DAISY
MAE BARBER,

Defendants.

**ORDER AND OPINION ON MOTION
FOR SUMMARY JUDGMENT**

1.     **THIS MATTER** is before the Court on plaintiff John Slattery's ("Slattery")
Motion for Summary Judgment (the "Motion") filed on 24 September 2020.  (Mot. for
Summ. J., ECF No. 29.)  Through the Motion and pursuant to Rule 56 of the North
Carolina Rules of Civil Procedure (the "Rule(s)"), Slattery moves for summary
judgment on all his claims against defendants AppyCity, LLC ("AppyCity"), Timothy
S. Fields ("Fields"), Melissa Crete ("Crete"), and Daisy Mae Fowler a/k/a Daisy Mae
Barber ("Fowler") (collectively, "Defendants").  (Mot. for Summ. J. 1.)  Slattery
initially also moved for summary judgment on his claims against Pamela Bowman
("Bowman"), (Mot. for Summ. J. 1), who was a defendant in this action until Slattery
voluntarily dismissed without prejudice all his claims against her on 20 November
2020, (V. Dismissal, ECF No. 34), thus rendering the Motion moot as to Bowman.

2.     For the reasons set forth in this Order and Opinion, the Court **GRANTS in
part** and **DENIES in part** the Motion as to AppyCity, Fields, Crete, and Fowler and
**DENIES** as **MOOT** the Motion as to Bowman.

*Tuggle Duggins P.A., by Jeffrey S. Southerland and Benjamin P. Hintze, for plaintiff John Slattery.*

*No counsel appeared for defendants AppyCity, LLC, Timothy S. Fields, Melissa Crete, Daisy Mae Fowler a/k/a Daisy Mae Barber, or Pamela Bowman*

Robinson, Judge.

## I.    INTRODUCTION

3.    This action arises out of Defendants' alleged wrongful conduct, including alleged false promises of unique and valuable technology and misrepresentations concerning potential profits, which Slattery contends induced him to invest in AppyCity, a sham technology company.  Slattery alleges that Fields and Crete, acting on their own behalf and on behalf of AppyCity as its agents, convinced Slattery to invest $500,000.00 in AppyCity.  Those funds were then allegedly diverted out of AppyCity, with Fowler and Bowman's assistance, for the benefit of Fields and Crete.  These alleged acts form the basis for Slattery's claims for fraud and negligent misrepresentation against Fields, Crete, and AppyCity, breach of fiduciary duty and constructive fraud against Fields and Crete, and unfair and deceptive trade practices and civil conspiracy against all Defendants.

## II.    PROCEDURAL HISTORY

4.    Slattery initiated this lawsuit on 11 September 2019 upon filing his Complaint against AppyCity, Fields, and Crete.  (ECF No. 3.)  This case was designated to the Business Court by Order of the Chief Justice of the Supreme Court of North Carolina that same day, (ECF No. 1), and then assigned to the undersigned by Order of the Chief Business Court Judge on 12 September 2019, (ECF No. 2).

5. On 7 February 2020, Slattery filed his Amended Complaint, adding Fowler and Bowman as defendants to this action. (Am. Compl., ECF No. 11.)

6. On 28 July 2020, the Court entered default pursuant to Rule 55(a) against AppyCity, Fields, Crete, Fowler, and Bowman based on their failure to timely answer or otherwise respond to Slattery's Amended Complaint. (ECF No. 26.)

7. Along with the Motion, Slattery filed a supporting brief and affidavits from Slattery and his wife, Susan Slattery, on 24 September 2020. (Mot. for Summ. J.; Aff. of John Slattery, ECF No. 29.2 ["J. Slattery Aff."]; Aff. of Susan Slattery, ECF No. 29.3 ["S. Slattery Aff."]; Br. in Supp., ECF No. 30.)

8. Although permitted to do so under Business Court Rule 7, AppyCity, Fields, Crete, Fowler, and Bowman did not file a responsive brief or any other document in opposition to the Motion.

9. On 17 November 2020, the Court held a video conference hearing on the Motion, at which Slattery was represented by his counsel. AppyCity, Fields, Crete, Fowler, and Bowman did not appear, either individually or through counsel, at the 17 November 2020 hearing.[1]

10. Following the 17 November 2020 hearing, Slattery voluntarily dismissed without prejudice his claims against Bowman. (V. Dismissal.)

11. The Motion is ripe for resolution.

---

[1] In the Notice of Hearing for the 17 November 2020 hearing, the Court directed Slattery's counsel to serve upon AppyCity, Fields, Crete, Fowler, and Bowman a copy of the Notice of Hearing by certified mail and to file an affidavit attesting to such service. (ECF No. 31.) Slattery's counsel filed an affidavit of service on 9 November 2020, confirming that counsel served Defendants with a copy of the Notice of Hearing by certified mail addressed to their last known addresses. (ECF No. 33.)

### III. FACTUAL BCKGROUND

12. The Court does not make findings of fact when ruling on motions for summary judgment. *See In re Estate of Pope*, 192 N.C. App. 321, 329 (2008). Instead, the Court will recite the relevant facts, taken from Slattery's Amended Complaint and the evidence submitted in support of the Motion, that are undisputed as a result of the entry of default against Defendants and their failure to respond to the Motion. *See id.* ("While it is true that a trial court may not, on summary judgment, make findings of fact resolving disputed issues of fact, when . . . the material facts are undisputed, an order may include a recitation of those undisputed facts."); *Spartan Leasing, Inc. v. Pollard*, 101 N.C. App. 450, 460 (1991) ("The effect of an entry of default is that the defendant against whom entry of default is made is deemed to have admitted the allegations in [the] complaint." (citing N.C.G.S. § 1A-1, Rule 8(d))).

#### A. The Parties

13. Slattery is a resident of Florida. (Am. Compl. ¶ 1.)

14. AppyCity is a limited liability company ("LLC") organized under the laws of North Carolina with its principal place of business located in Rocky Point, North Carolina. (Am. Compl. ¶ 2.)

15. Fields is a resident of Wilmington, North Carolina. (Am. Compl. ¶ 4.) At all relevant times, Fields was an owner, manager, and agent of AppyCity. (Am. Compl. ¶¶ 4, 17; J. Slattery Aff. ¶ 14.)

16. Crete is a resident of Wilmington, North Carolina. (Am. Compl. ¶ 5.) At all relevant times, Crete was an owner and agent of AppyCity. (Am. Compl. ¶¶ 5, 17; J. Slattery Aff. ¶ 14.)

17. Fields and Crete collectively owned a majority interest in AppyCity during the time period relevant to the Amended Complaint, and by virtue of their collective majority interest, they exercised complete control over all aspects of AppyCity, including AppyCity's business operations and financial information. (Am. Compl. ¶¶ 17–19; J. Slattery Aff. ¶ 14.)

18. Fowler is a resident of Aberdeen, North Carolina. (Am. Compl. ¶ 6.) Fowler is Fields' mother. (J. Slattery Aff. ¶ 30.)

**B.     Fields and Crete Solicit Slattery's Investment**

19. In 2015, Slattery met Fields and Crete through Jonathan Weiss ("Weiss"), a longtime friend of Slattery. (Am. Compl. ¶ 13; J. Slattery Aff. ¶ 3.) Fields and Crete introduced themselves to Slattery as owners of various technology businesses that developed and designed software applications, including North Carolina-based The Education App, LLC ("The Education App") and AppyCity. (Am. Compl. ¶ 3; J. Slattery Aff. ¶ 3.) Fields and Crete invited Slattery, who had no professional experience in the technology industry, to invest in The Education App and AppyCity. (J. Slattery Aff. ¶¶ 5, 8.)

20. Fields and Crete represented to Slattery that they had developed breakthrough, unique, and valuable technology (i.e., applications), making The Education App and AppyCity valuable companies that were likely to be very

profitable. (J. Slattery Aff. ¶¶ 4, 6.) Fields and Crete also represented to Slattery that AppyCity was an extremely valuable company by virtue of being a party to numerous existing and expected contracts, that AppyCity would soon be realizing substantial revenues, and that AppyCity may ultimately be sold for a significant profit. (J. Slattery Aff. ¶ 7.) These representations by Fields and Crete were false and were known by Fields and Crete to be false at the time they were made. (Am. Compl. ¶¶ 15, 35.) In reality, Fields and Crete's technology had no value whatsoever. (Am. Compl. ¶ 15.)

21. Fields and Crete were aware of Slattery's lack of experience in the technology industry and that he was relying on their false statements regarding the value and performance of their technology to make a decision about investing in The Education App and AppyCity. (J. Slattery Aff. ¶ 8.)

22. Based on Fields and Crete's false representations, Slattery decided to invest in the companies owned by Fields and Crete. (Am. Compl. ¶¶ 20, 35; J. Slattery Aff. ¶ 9.) First, beginning on or around 10 May 2015, Slattery acquired a 10% ownership interest in The Education App by paying Fields, The Education App, and Weiss (a part owner of The Education App) three separate amounts that together totaled $250,000.00. (Am. Compl. ¶ 21; J. Slattery Aff. ¶ 10.)

23. Then, in or around September 2016, Fields and Crete contacted Slattery and told him that, though The Education App was performing adequately, AppyCity's business was "exploding" and "billion-dollar companies" were courting AppyCity for a potential acquisition. (J. Slattery Aff. ¶ 11.) Fields and Crete informed Slattery

that AppyCity needed additional funds for necessary short-term operations and growth prior to the anticipated sale of AppyCity to a major technology company. (J. Slattery Aff. ¶ 12.) These representations by Fields and Crete were false and were known by Fields and Crete to be false at the time they were made. (Am. Compl. ¶¶ 24, 26.) Fields and Crete intended for Slattery to rely on these false representations when deciding whether to invest in AppyCity. (Am. Compl. ¶ 26.)

24. Based on Fields and Crete's false representations, Slattery invested a total of $500,000.00 into AppyCity. (Am. Compl. ¶¶ 25–28, 35; J. Slattery Aff. ¶ 13.) He acquired a 5% ownership interest in AppyCity by (1) transferring his 10% interest in The Education App (which he had purchased for a total sum of $250,000.00) to Fields and (2) paying Fields an additional $250,000.00. (Am. Compl. ¶¶ 25, 35; J. Slattery Aff. ¶ 13.)

25. Had Slattery known the truth about Fields and Crete's false representations, he would not have invested in any of their companies. (Am. Compl. ¶¶ 35–36.)

26. Furthermore, Slattery had no means to verify or refute Fields and Crete's false representations. (Am. Compl. ¶ 27.) Fields and Crete had substantial expertise and knowledge regarding the technology industry. (Am. Compl. ¶ 27.) Slattery, in contrast, had no technical expertise (as he told Fields and Crete) in computer technology, computer coding, application development, or application valuations. (Am. Compl. ¶ 27.) Also, at the time Fields and Crete solicited Slattery's investment, the applications associated with AppyCity were fairly new and untested, and there

was no established or objective evaluation criteria for such technology in the relevant marketplace. (Am. Compl. ¶ 27.) And when Slattery specifically questioned Fields and Crete about the applications, they provided concrete assurances and statements regarding the applications' value, as well as AppyCity's supposed value and ongoing negotiations with other companies, which Fields and Crete claimed they could not discuss in detail due to their confidential nature. (Am. Compl. ¶ 27.)

### C. The Netflix Deal

27. In February 2017, Slattery contacted Fields and Crete seeking an update on AppyCity. (J. Slattery Aff. ¶ 15.) Fields and Crete informed Slattery that AppyCity was in serious negotiations with Netflix and that Netflix was interested in acquiring AppyCity's technology in connection with Netflix launching a mobile gaming platform. (J. Slattery Aff. ¶ 15.) Fields and Crete also informed Slattery that Chris Christenson ("Christenson"), an attorney representing AppyCity, had negotiated a deal for the sale of AppyCity's technology to Netflix for $1.2 billion. (J. Slattery Aff. ¶ 16.) These representations by Fields and Crete were false and were known by Fields and Crete to be false at the time they were made. (Am. Compl. ¶ 29.) Fields and Crete made these false representations to conceal the sham nature of AppyCity. (Am. Compl. ¶ 29.)

28. Concerned with the potential tax consequences of the anticipated deal with Netflix, Slattery retained a tax attorney named Brian Kennedy ("Kennedy"). (J. Slattery Aff. ¶ 17.) On 8 February 2017, Slattery, Kennedy, and Fields had a conference call, during which Slattery offered to personally pay for Kennedy's time to

review the proposed Netflix contract and to consult and collaborate with Christenson regarding the proposed Netflix contract. (J. Slattery Aff. ¶ 18.) Fields agreed to Slattery's proposal and said he would provide Slattery with Christenson's contact information. (J. Slattery Aff. ¶ 18.) Following this conference call, Slattery repeatedly requested that Fields and Crete provide the contact information for Christenson, but all these requests were ignored. (J. Slattery Aff. ¶ 19.)

29. Around this same time, Fields told Slattery that Slattery should consider the possibility of converting the proceeds from the proposed Netflix contract to Bitcoin or other cryptocurrency, because, according to Fields, cryptocurrency is untraceable, has no central bank, and could aid in avoiding tax liability. (J. Slattery Aff. ¶ 20.) Fields repeatedly discussed Bitcoin and cryptocurrency with Slattery, including the fact that Fields had set up Bitcoin wallets for himself, Crete, Fowler, and Bowman (Crete's mother). (J. Slattery Aff. ¶¶ 20, 31.)

30. Fields and Crete became increasingly evasive regarding the purported Netflix deal. (J. Slattery Aff. ¶ 21.) On or around 21 August 2017, Fields told Slattery that Fields was with Christenson meeting with Apple at its headquarters in Cupertino, California in connection with the Netflix deal. (J. Slattery Aff. ¶ 21.) Unbeknownst to Fields, Slattery and his wife were visiting California at the time and were near Cupertino. (J. Slattery Aff. ¶ 21; S. Slattery Aff. ¶ 2.) Slattery texted Fields that he was in the area and requested a meeting with Fields and Christenson. (J. Slattery Aff. ¶ 21.) Fields, however, did not respond to this request and instead

turned off his phone or otherwise made himself unreachable by phone. (J. Slattery Aff. ¶ 21.)

**D.    Slattery Discovers the Truth Surrounding His Investment**

31.    The Netflix contract never materialized, Fields and Crete never provided Slattery with contact information for Christenson, and Slattery never received any funds following his investment in AppyCity. (J. Slattery Aff. ¶ 22.) Moreover, Slattery discovered that Fields, Crete, and AppyCity were never in contract negotiations with Netflix or any other company, that AppyCity never had any unique technology or any proprietary technology that functioned as represented by Fields and Crete, and that AppyCity was entirely without value. (J. Slattery Aff. ¶ 22.) Slattery also discovered that Christenson did not exist. (J. Slattery Aff. ¶ 22.)

32.    Slattery demanded financial records from AppyCity, including K-1 forms for tax reporting, but he never received this information from AppyCity. (J. Slattery Aff. ¶ 23.) Slattery also demanded that Fields and Crete account for the operations of AppyCity, the financial condition of AppyCity, and the assets of AppyCity, and to demonstrate that AppyCity was anything other than a sham entity intended to defraud Slattery of his invested funds. (J. Slattery Aff. ¶ 24.) Fields and Crete never responded to Slattery's demands and have since been evading Slattery. (J. Slattery Aff. ¶ 24.)

33.    Ultimately, it became clear to Slattery that the $500,000.00 sum he invested in AppyCity was not used to fund the operations of AppyCity or for any other

appropriate or legitimate purpose and that those funds were instead diverted out of AppyCity for the benefit of Fields and Crete.  (J. Slattery Aff. ¶ 25.)

34.     Slattery's wife spoke with Bowman on the telephone on 16 September 2019, during which she told Bowman that Fields and Crete had stolen from Slattery and that she believed Bowman was actively helping Fields and Crete conceal their wrongful conduct and evade the consequences of their actions.  (S. Slattery Aff. ¶ 3.) Bowman responded by stating that "we've hidden the money where you will never find it," ending the call thereafter.  (S. Slattery Aff. ¶ 3.)

35.     Less than two hours after this telephone call, Fields called Slattery's wife and admitted to her that Bowman had received and concealed funds stolen from Slattery.  (S. Slattery Aff. ¶ 4.)  Fields also stated "that he didn't care if [Slattery's wife] knew" and ended the call.  (S. Slattery Aff. ¶ 4.)

36.     On 2 March 2020, Slattery received a telephone call from Fields.  (J. Slattery Aff. ¶¶ 30, 31.)  Slattery informed Fields during the call that Slattery knew AppyCity was a sham business and that Fields and Crete had lied to Slattery about AppyCity, its technology, and its business prospects in order to defraud Slattery of $500,000.00.  (J. Slattery Aff. ¶ 31.)  Fields, in turn, informed Slattery that Fields and Crete had transferred the money invested by Slattery and other AppyCity investors to Fowler and Bowman and that Fowler and Bowman were aware that these funds had been wrongfully taken from AppyCity investors.  (J. Slattery Aff. ¶ 31.) Fields also revealed to Slattery that much of Slattery's money had been converted to

cryptocurrency, such as Bitcoin, which, according to Fields, could not be attached as part of a lawsuit or judgment. (J. Slattery Aff. ¶ 31.)

37.     Slattery's phone call with Fields confirmed that Fields and Crete knew that Slattery had sued them, that Fields and Crete had taken Slattery's investment out of AppyCity for themselves, and that Fields and Crete, with the aid of their mothers, had converted a significant sum of money in their possession into cryptocurrency in an attempt to hide assets and prevent creditors from finding and attaching their fraudulently obtained assets. (J. Slattery Aff. ¶ 31.) According to Slattery, North Carolina arrest warrants have been issued for Fields and Crete related to fraud against other persons. (J. Slattery Aff. ¶ 31.)

## IV.    LEGAL STANDARD

38.     Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c). "An issue is 'genuine' if it can be proven by substantial evidence and a fact is 'material' if it would constitute or irrevocably establish any material element of a claim or a defense." *Fullwood v. Barnes*, 250 N.C. App. 31, 36 (2016) (quoting *Lowe v. Bradford*, 305 N.C. 366, 369 (1982)).

39.     The moving party bears the burden of showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App. 561, 563 (2008). The Court must

view the evidence in the light most favorable to the nonmovant. *Dobson v. Harris*, 352 N.C. 77, 83 (2000). However, the nonmovant "may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial. If [the nonmovant] does not so respond, summary judgment, if appropriate, shall be entered against [the nonmovant]." N.C.G.S. § 1A-1, Rule 56(e).

40.     In addition, "Rule 56(c) allows the trial court to grant summary judgment to the non-moving party." *Elliott v. Enka-Candler Fire & Rescue Dep't, Inc.*, 213 N.C. App. 160, 170 (2011). "Summary judgment in favor of the non-movant is appropriate when the evidence presented demonstrates that no material issues of fact are in dispute, and the non-movant is entitled to entry of judgment as a matter of law." *Sullivan v. Pender Cty.*, 196 N.C. App. 726, 731 (2009) (quoting *A-S-P Assocs. v. City of Raleigh*, 298 N.C. 207, 212 (1979)); *see also Elliott*, 213 N.C. App. at 170 (noting that "under Rule 56(c), the trial court could have granted plaintiff summary judgment based on the materials presented by defendant, even without plaintiff's motion").

## V.     LIABILITY ANALYSIS

41.     Having reviewed all appropriate matters of record, the Court will evaluate whether Slattery is entitled to summary judgment on the claims asserted in his Amended Complaint and will also consider whether summary judgment in favor of Defendants is appropriate on any of those claims.

## A.   Fraud in the Inducement

42.   The Court begins with Slattery's fraud claim against Fields, Crete, and AppyCity.  (Am. Compl. ¶¶ 34–38.)

43.   "The essential elements of fraud are: (1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Rowan Cnty. Bd. of Educ. v. U.S. Gypsum Co.*, 332 N.C. 1, 17 (1992) (cleaned up).  "Additionally, reliance on alleged false representations must be reasonable." *Sullivan v. Mebane Packaging Grp., Inc.*, 158 N.C. App. 19, 26 (2003) (citation omitted).  Each of these requirements is met here.

44.   First, Fields and Crete—acting on their own behalf and on behalf of AppyCity as its agents—made the following false representations to Slattery when soliciting his investment.

> a. AppyCity possessed breakthrough, unique, and valuable technology developed by Fields and Crete, which functioned as described by Fields and Crete.
>
> b. AppyCity was a party to numerous existing and expected contracts, which made AppyCity a valuable company.
>
> c. AppyCity would soon be generating substantial revenues and would ultimately be sold for a significant profit.

d. AppyCity needed funds for the operations and growth of the business in connection with an expected acquisition of AppyCity by a larger technology company.

e. The funds invested by Slattery would, in fact, be used for the operations and growth of AppyCity.

45. These false representations by Fields and Crete were material to Slattery's decision to invest in AppyCity, as he would not have provided funds to AppyCity if he had known the truth about these false representations. *See Godfrey v. Res-Care, Inc.*, 165 N.C. App. 68, 75–76 (2004) (stating that a fact is "material" if, when made known to a party, the fact "would have influenced [that party's] judgment or decision" (quoting *White Sewing Mach. Co. v. Bullock*, 161 N.C. 1, 7 (N.C. 1912))).

46. As to the second and third elements, Fields and Crete knew that their representations were false when they made them to Slattery, and they made these false representations for the purpose of deceiving Slattery into investing in a sham company. *See Carcano v. JBSS, LLC*, 200 N.C. App. 162, 177 (2009).

47. Regarding the fourth element, Slattery made the decision to invest in AppyCity in reliance on Fields and Crete's false representations. To satisfy the reasonable reliance requirement, a plaintiff must ordinarily show "that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." *Hudson-Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 346 (1999). But where, as here, the parties are not on equal footing, and a defendant possessing superior knowledge and/or experience makes a representation

without giving the plaintiff reason to suspect the representation is false, the plaintiff may rely upon that representation. *See Walker v. Town of Stoneville*, 211 N.C. App. 24, 34–35 (2011); *see also Little v. Stogner*, 162 N.C. App. 25, 30 (2004); *Higgins v. Synergy Coverage Sols., LLC*, 2020 NCBC LEXIS 6, at *31–34 (N.C. Super. Ct. Jan. 15, 2020). Moreover, as alleged in the Amended Complaint and now admitted due to the entry of default against Defendants, Slattery's reliance on Fields and Crete's false representations was reasonable. (*See* Am. Compl. ¶¶ 28, 35.)

48. Lastly, Slattery was damaged in the amount of $500,000.00 as a result of the fraudulent scheme that Fields and Crete perpetrated on their own behalf and on behalf of AppyCity as its agents.

49. Having considered the undisputed facts supporting Slattery's fraud claim against Fields, Crete, and AppyCity, the Court concludes that there is no genuine issue as to any material fact for this claim and that Slattery is entitled to summary judgment on this claim as a matter of law. The Court will thus grant the Motion as to this claim.

**B. Negligent Misrepresentation**

50. Slattery has also brought a claim for negligent misrepresentation against Fields, Crete, and AppyCity. (Am. Compl. ¶¶ 39–42.)

51. Our appellate courts have described the tort of negligent misrepresentation as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, [and thus] is subject to liability for pecuniary loss caused

to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Rountree v. Chowan Cty.*, 252 N.C. App. 155, 160 (2017) (alteration in original) (quoting *Simms v. Prudential Life Ins. Co. of Am.*, 140 N.C. App. 529, 534 (2000)). "Such a duty commonly arises within professional relationships." *Id.*

52. The undisputed facts before the Court show that Fields and Crete—acting on their own behalf and on behalf of AppyCity as its agents—had a pecuniary interest in obtaining funds from Slattery and that Fields and Crete supplied false information to Slattery when providing guidance to him regarding Slattery's business decision to invest in AppyCity. The undisputed facts also show that Fields and Crete failed to exercise reasonable care or competence as to this business transaction by falsely representing, among other things, that they were in possession of unique and valuable technology that made AppyCity a valuable company when, in fact, Fields, Crete, and AppyCity had no valuable technology and the company was entirely without value.

53. As to justifiable reliance, this requirement is "analogous" to the reasonable reliance requirement for a fraud claim. *Marcus Bros. Textiles, Inc. v. Price Waterhouse, L.L.P.*, 350 N.C. 214, 224 (1999) (citation omitted); *see also Bucci v. Burns*, 2018 NCBC LEXIS 93, at *4 (N.C. Super. Ct. Sept. 4, 2018) ("Justifiable reliance is an essential element of claims for fraud . . . and negligent misrepresentation."). Therefore, based on the same considerations discussed above in the Court's analysis of reasonable reliance, as well as the undisputed facts

supporting Slattery's negligent misrepresentation claim, the Court concludes that Slattery justifiably relied on Fields and Crete's false representations to his detriment. To the extent a more specific determination is necessary, the Court further concludes, on the undisputed facts before it, that Slattery could not have discovered the true facts regarding AppyCity and was prevented from finding such facts based on Fields, Crete, and AppyCity's conduct.

54. Furthermore, Slattery experienced pecuniary loss in the form of providing $500,000.00 to a sham company as a result of his justifiable reliance on the misrepresentations of Fields and Crete, who were acting on their own behalf and on behalf of AppyCity as its agents.

55. Thus, for these reasons, the Court concludes that that there is no genuine issue as to any material fact for Slattery's negligent misrepresentation claim against Fields, Crete, and AppyCity and that Slattery is entitled to summary judgment on this claim as a matter of law, thereby warranting the granting of the Motion as to this claim.

## C. Unfair and Deceptive Trade Practices

56. Slattery contends that all Defendants violated N.C.G.S. § 75-1.1 by engaging in unfair and deceptive trade practices ("UDTP"). (Am. Compl. ¶¶ 43–45; Br. in Supp. 13.)

57. To prevail on a UDTP claim brought under section 75-1.1, "a plaintiff must show: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3)

which proximately caused injury to plaintiffs." *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 71–72 (2007) (citation omitted).

58. Notwithstanding the broad statutory definition of commerce, *see* N.C.G.S. § 75-1.1(b), "securities transactions are beyond the scope of N.C.G.S. § 75-1.1," *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 593 (1991) (quoting *Skinner v. E. F. Hutton & Co.*, 314 N.C. 267, 275 (1985)). "Our legislature did not intend for section 75-1.1, 'with its treble damages provision, to apply to securities transactions which were already subject to pervasive and intricate regulation' under state and federal statutes." *Bucci v. Burns*, 2018 NCBC LEXIS 37, at *26 (N.C. Super. Ct. Apr. 25, 2018) (quoting *Skinner*, 314 N.C. at 275).

59. At bottom, Slattery's UDTP claim arises from his purchase of an ownership interest in an LLC, AppyCity—a transaction which Slattery repeatedly characterizes in the Amended Complaint as an investment. And even though Slattery became a member of AppyCity through this transaction, Slattery did not exercise any control over any aspect of the company, since Fields and Crete completely controlled AppyCity and its affairs. Therefore, the basis for Slattery's UDTP claim is, in effect, the type of securities transaction that falls outside the scope of section 75-1.1. *See, e.g.*, *Bickley v. Fordin*, 258 N.C. App. 1, 4–5 (2018) (holding that a plaintiff selling his membership interest in an LLC back to the LLC was "analogous" to a securities transaction and therefore fell outside the scope of section 75-1.1); *Saw Plastic, LLC v. Sturrus*, 2017 NCBC LEXIS 76, at *14–16 (N.C. Super. Ct. Aug. 25, 2017) (noting that there is a presumption under the North Carolina Securities Act that a

membership interest in an LLC is a security, which can be rebutted, by among another things, evidence that the member retained the right to control the LLC); *see also* 18 NCAC 06A.1510.

60. Thus, in accordance with controlling North Carolina law on the interplay between section 75-1.1 and securities transactions, as well as the absence of a genuine issue as to any material fact, the Court will deny the Motion as to Slattery's UDTP claim and instead grant summary judgment to Defendants on this claim.

**D.     Breach of Fiduciary Duty and Constructive Fraud**

61. The Court next turns to Slattery's breach of fiduciary duty and constructive fraud claims against Fields and Crete. (Am. Compl. ¶¶ 46–62.)

62. Although breach of fiduciary duty and constructive fraud are legally distinct claims, *see White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 293–95 (2004), both claims here, as asserted in the Amended Complaint, rest on an alleged fiduciary relationship between Slattery, on the one hand, and Fields and Crete, on the other. (*See* Am. Compl. ¶¶ 47, 50–51, 57–58.)

63. A fiduciary relationship "exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Lockerman v. S. River Elec. Membership Corp.*, 250 N.C. App. 631, 635 (2016) (quoting *Abbitt v. Gregory*, 201 N.C. 577, 598 (1931)). As explained by our Court of Appeals, the North Carolina Limited Liability Company Act "does not create fiduciary duties among members" of an LLC. *Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 473 (2009).

Nonetheless, Slattery contends that Fields and Crete owed a fiduciary duty to Slattery, a minority member of AppyCity, based on Fields and Crete collectively holding a majority interest in AppyCity and exercising complete control over the company. (*See* Am. Compl. ¶¶ 47, 57; Br. in Supp. 16–17.)

64. Relying on the well-settled principle that a corporation's "controlling shareholder owes a fiduciary duty to minority shareholders," *Kaplan*, 196 N.C. App. at 473, this Court has previously stated that "a holder of a majority interest who exercises control over the LLC owes a fiduciary duty to minority interest members," *Fiske v. Kieffer*, 2016 NCBC LEXIS 22, at *9 (N.C. Super. Ct. Mar. 9, 2016) (citing *Kaplan*, 196 N.C. App. at 473). The Court, however, has also "cautioned against a broad application [of this borrowed exception] because of the fundamental differences between LLCs and corporations." *Strategic Mgmt. Decisions v. Sales Performance Int'l*, 2017 NCBC LEXIS 69, at *10 (N.C. Super. Ct. Aug. 7, 2017).

65. For this reason, notwithstanding the fact that courts have held that a group of shareholders, with an aggregated majority interest in the corporation, may owe a fiduciary duty to a minority shareholder under the controlling shareholder exception, this Court has consistently declined to impose a similar fiduciary duty upon two or more members of an LLC, who collectively, but not individually, own a majority interest in the LLC. *See, e.g., Bennett v. Bennett*, 2019 NCBC LEXIS 19, at *19–20 (N.C. Super. Ct. March 15, 2019); *Fiske*, 2016 NCBC LEXIS 22, at *9–10; *HCW Ret. & Fin. Servs., LLC v. HCW Employee Benefit Servs., LLC*, 2015 NCBC LEXIS 73, at

*47 n.102 (N.C. Super. Ct. July 14, 2015); *Blythe v. Bell*, 2013 NCBC LEXIS 17, at *13–14 (N.C. Super. Ct. Apr. 8, 2013).

66. Slattery does not address or distinguish these decisions, and the Court sees no reason to depart from them in this case. As a result, because Slattery has not alleged or presented any evidence, at this stage of the litigation, that either Fields or Crete individually owned a majority interest in AppyCity, there is a genuine issue of material fact as to whether Fields and Crete owed him a fiduciary duty based on their respective ownership interests in AppyCity. (*Cf.* Am. Compl. ¶ 17 ("Upon information and belief, FIELDS and CRETE collectively own a controlling majority interest in . . . APPYCITY."); J. Slattery Aff. ¶ 14 ("Fields and Crete jointly controlled a majority interest in AppyCity and exercised complete control over all aspects of AppyCity.").)

67. Thus, the Court will deny Slattery's Motion as to his breach of fiduciary duty and constructive frauds claims against Fields and Crete.

**E.    Civil Conspiracy**

68. Lastly, the Court considers Slattery's claim for civil conspiracy against all Defendants. (Am. Compl. ¶¶ 63–65.)

69. North Carolina does not recognize a separate cause of action for civil conspiracy. *Strickland v. Hedrick*, 194 N.C. App. 1, 19 (2008). A plaintiff has a claim for civil conspiracy "only where there is an underlying claim for unlawful conduct." *Sellers v. Morton*, 191 N.C. App. 75, 83 (2008) (quoting *Toomer v. Garrett*, 155 N.C. App. 462, 483 (2002)). Accordingly, Slattery may base his civil conspiracy claim on his underlying fraud in the inducement claim. *See Nye v. Oates*, 96 N.C. App. 343,

346–47 (1989) (noting that North Carolina "permits one defrauded to recover from anyone who facilitated the fraud by agreeing for it to be accomplished").

70.    To establish a civil conspiracy theory of liability, the plaintiff must first offer "proof of an agreement between two or more persons." *Sellers*, 191 N.C. App. at 83. Second, the plaintiff "must present evidence of an 'overt act' committed by at least one conspirator in furtherance of the 'common objective.'" *Holt v. Williamson*, 125 N.C. App. 305, 319 (1997) (citation omitted). Third, the plaintiff must prove that the overt act committed in furtherance of the conspiracy resulted in damages to the plaintiff. *See id.* at 318–19. "[A]ll of the conspirators are liable, jointly and severally, for the act of any one of them done in furtherance of the agreement." *Neugent v. Beroth Oil Co.*, 149 N.C. App. 38, 53 (2002) (citation omitted).

71.    The undisputed facts before the Court show the existence of an agreement between all Defendants to defraud Slattery. The undisputed facts also show that each Defendant committed overt acts in furtherance of this agreement. Fields and Crete, acting on their own behalf and on behalf of AppyCity as it agents, made false representations to Slattery, while Fowler knowingly received and concealed Slattery's stolen funds and helped Fields and Crete convert those funds into cryptocurrency in an effort to prevent the tracing and attachment of those funds.

72.    Finally, it is undisputed that Slattery was damaged by Defendants' overt acts when he was induced to provide $500,000.00 to AppyCity, an investment for which he received nothing of value in return and which was then stolen and concealed by Fields, Crete, and Fowler.

73. Accordingly, the Court will grant the Motion as to Slattery's civil conspiracy claim and hold all Defendants liable, jointly and severally, for all damages to Slattery resulting from their conspiracy to defraud Slattery.

## VI. DAMAGES ANALYSIS

74. Having granted summary judgment in Slattery's favor with respect to liability for some of Slattery's legal claims as set forth above in section V, the Court now turns to the issue of damages. *See Frank H. Conner Co. v. Spanish Inns Charlotte, Ltd.*, 294 N.C. 661, 676 (1978) (stating that "summary judgment may be granted, not only as to an issue of liability, but also as to 'the amount of damages or other relief' where such issues are not in controversy" pursuant to Rule 56(d)).

### A. Compensatory Damages

75. Slattery seeks to recover compensatory damages from all Defendants (except Bowman as a result of the voluntary dismissal). (Am. Compl. 14.)

76. "The objective of compensatory damages is to restore the plaintiff to his original condition or to make the plaintiff whole." *Watson v. Dixon*, 352 N.C. 343, 347 (2000). An award of damages is intended to give back to a successful plaintiff "that which was lost as far as it may be done by compensation in money." *Shera v. N.C. State Univ. Veterinary Teaching Hosp.*, 219 N.C. App. 117, 126 (2012) (emphasis omitted) (citation omitted).

77. Here, Slattery is entitled to compensatory damages in the total amount of $500,000.00 as a proximate result of Defendants' liability on the fraud, negligent

misrepresentation, and civil conspiracy claims. This damages award applies to all Defendants (but not Bowman) jointly and severally.

78. Slattery is further entitled to recover damages in the form of prejudgment interest on the compensatory damages award of $500,000.00, at the legal rate, from the date this action was commenced until the judgment is satisfied. *See* N.C.G.S. § 24-5(b).

## B. **Punitive Damages**

79. Slattery also seeks to recover punitive damages from all Defendants (except Bowman as a result of the voluntary dismissal). (Am. Compl. 14.)

80. Punitive damages may be appropriate "to punish a defendant for egregiously wrongful acts and to deter the defendant and others from committing similar wrongful acts." N.C.G.S. § 1D–1. However, such damages may only be awarded if the plaintiff, in addition to proving that the defendant is liable for compensatory damages, also proves by clear and convincing evidence that one of the statutorily enumerated aggravating factors—fraud, malice, or willful or wanton conduct—was present. *Id.* § 1D–15(a)–(b). "Punitive damages may be awarded against a person only if that person participated in the conduct constituting the aggravating factor giving rise to the punitive damages, or if, in the case of a corporation, the officers, directors, or managers of the corporation participated in or condoned the conduct constituting the aggravating factor giving rise to punitive damages." *Id.* § 1D–15(c).

81.     Based on the undisputed facts and the unrebutted evidence submitted by Slattery, the Court determines that there is no genuine issue of material fact as to there being clear and convincing evidence of the existence of fraud, one of the aggravating factors that justifies punitive damages.  As discussed above, Slattery has proven that Fields and Crete defrauded Slattery of his invested funds in AppyCity, a sham company controlled by Fields and Crete.  In addition, the undisputed facts show that both Fowler and the manager of AppyCity (Fields) actively participated in this fraud.  Accordingly, the Court concludes that Slattery has met his burden of showing that a punitive damages award against all Defendants (but not Bowman) is warranted here based on the conduct and liability of Defendants, in addition to establishing Defendants' liability for compensatory damages.

82.     In the exercise of its discretion, *see id.* § 1D-35, the Court determines that the punitive damages award to Slattery should be three times the compensatory damages awarded to Slattery, for a total punitive damages award of $1,500,000.00.  The Court further concludes that this amount bears a rational relationship to the sum necessary to punish Defendants for their egregiously wrongful acts and to deter Defendants and others from committing similar wrongful acts.  *See Nunn v. Allen*, 154 N.C. App. 523, 542 (2002).  This amount represents the maximum award of punitive damages permitted by statute, which is limited to three times the amount of compensatory damages or $250,000.00, whichever is greater.  N.C.G.S. § 1D-25.

## C.     Total Damages

83.     The total damages award in favor of Slattery and against Defendants, jointly and severally, taking into account compensatory damages of $500,000.00 and punitive damages of $1,500,000.00, is $2,000,000.00. Further, prejudgment interest shall accrue on the compensatory damages award, at the legal rate, from the date the action was initiated until the judgment is satisfied, as calculated by the Clerk of Superior Court.[2]

## VII.     CONCLUSION

84.     For the foregoing reasons, the Court hereby **ORDERS** as follows.

    a. The Court **GRANTS** the Motion as to Slattery's fraud in the inducement claim against AppyCity, Fields, and Crete and **GRANTS** summary judgment in favor of Slattery on this claim.

    b. The Court **GRANTS** the Motion as to Slattery's negligent misrepresentation claim against AppyCity, Fields, and Crete and **GRANTS** summary judgment in favor of Slattery on this claim.

    c. The Court **DENIES** the Motion as to Slattery's UDTP claim against all Defendants and **GRANTS** summary judgment in favor of Defendants on this claim.

    d. The Court **DENIES** the Motion as to Slattery's breach of fiduciary duty claim against Fields and Crete.

---

[2] Slattery's counsel expressly indicated, during the 17 November 2020 hearing, that Slattery will not seek an award of costs or attorneys' fees, and therefore, none are awarded here.

e. The Court **DENIES** the Motion as to Slattery's constructive fraud claim against Fields and Crete.

f. The Court **GRANTS** the Motion as to Slattery's civil conspiracy claim against all Defendants and **GRANTS** summary judgment in favor of Slattery on this claim.

g. The Court **AWARDS** total damages in favor of Slattery and against all Defendants, jointly and severally, in the amount of $2,000,000.00 ($500,000.00 in compensatory damages and $1,500,000.00 in punitive damages). **FURTHER**, prejudgment interest shall accrue on the compensatory damages award, at the legal rate, from the date the action was initiated until the date the judgment is satisfied, in an amount to be calculated by the Clerk of Superior Court.

h. As a result of Slattery voluntarily dismissing without prejudice his claims against Bowman, the Motion is **DENIED** as **MOOT** as to Bowman.

**SO ORDERED**, this the 24th day of March, 2021.

/s/ Michael L. Robinson

Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases